# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 10, 2015           Decided June 23, 2015

No. 14-7017

IN RE: HARMAN INTERNATIONAL INDUSTRIES, INC. SECURITIES
LITIGATION,

ARKANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,
APPELLANT

CHEOLAN KIM AND CITY OF BOCA RATON GENERAL
EMPLOYEES PENSION PLAN, ON BEHALF OF ITSELF AND ALL
OTHERS SIMILARLY SITUATED - (CA-07-2175),
APPELLEES

v.

HARMAN INTERNATIONAL INDUSTRIES INC., ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01757)

———

*Steven J. Toll* argued the cause for appellant. With him on
the briefs was *Daniel S. Sommers*.

*Traci L. Lovitt* argued the cause for appellees. With her on the brief were *Thomas F. Cullen Jr.*, *Robert C. Micheletto*, *Kelly A. Carrero*, and *Ian J. Samuel*.

Before: HENDERSON, ROGERS and PILLARD, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Between April 2007 and February 2008, Harman International Industries, Inc., and three of its officers are alleged to have knowingly and recklessly propped up the Company's stock price by making materially false and misleading statements about the Company's financial condition and by failing to disclose related material adverse facts, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b); Rule 10b-5, 17 C.F.R. § 240.10b-5; and Section 20(a) of the Act, 15 U.S.C. § 78t(a). This is alleged to have occurred during a period when the Company was being considered for acquisition. Only after the acquisition did not go forward, it is alleged, did the Company disclose information that would have been important to a reasonable investor. The district court dismissed the complaint for failure to state a claim.

On appeal, the only question is whether the complaint stated a plausible claim of securities fraud with respect to three alleged statements that focus primarily on the status of the Company's personal navigational device ("PND") products. Consistent with the standard to be applied in considering a motion to dismiss for failure to state a claim, we necessarily offer no view on the merits of the allegations. The district court concluded two of the alleged statements fell within the statutory safe harbor for forward-looking statements accompanied by meaningful cautionary language and the third statement was "puffery" and thus inactionable. Upon *de novo* review, we hold that although

the challenge to the forward-looking nature of two statements was forfeited, the complaint plausibly alleges that those statements were not entitled to safe harbor protection because the accompanying cautionary statements were misleading insofar as they failed to account for historical facts about PNDs that would have been important to a reasonable investor. We also hold that the third statement, in the Company's annual report, is plausibly understood, in the alleged circumstances, as a specific statement about its recent financial performance and not mere "puffery." Because loss causation was adequately pleaded and the Section 20(a) claims alleged against the individual defendants are plausible, we reverse the dismissal of the complaint as to these three statements and remand the case to the district court for further proceedings.

## I.

Section 10(b) of the Securities Exchange Act of 1934, as amended, provides that it shall be unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 closely tracks Section 10(b), providing that, "in connection with the purchase or sale of any security," it is unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not

misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b-5. The Act, as amended, provides a safe harbor from liability for forward-looking statements that are "identified as . . . forward-looking" and "accompanied by *meaningful* cautionary statements identifying *important factors* that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i) (emphases added); *see* Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (1995). Section 20(a) subjects to liability "[e]very person who, directly or indirectly, controls any person liable under" another provision of the Act or implementing rules. 15 U.S.C. § 78t(a).

In 2008, when the consolidated class action complaint was filed, Harman International Industries, Inc., was "a leading manufacturer of high-quality, high fidelity audio products and electronic systems for the automotive, consumer, and professional markets in the Americas, Europe, and Asia." Compl. ¶ 2. Its products included information and entertainment systems for automobiles. According to the complaint, on April 26, 2007, the Company announced its potential acquisition by an entity formed by Kohlberg Kravis Roberts and an affiliate of Goldman Sachs, two prominent private equity firms. The same day, and on two subsequent occasions at issue, the Company, through its chief executive officers and chief financial officer and in its FY 2007 Annual Report, made statements regarding past and forecasted sales of its products, including PNDs. The price of the Company's stock rose markedly following the April 2007 merger announcement and held steady through September 2007. When the Company announced in September 2007 that the acquisition plans had been abandoned, the Company's share

price fell by more than 24 percent. It fell again in January 2008 when the Company lowered projected earnings per share, noting among other things "a major shift" in its PND business. *Id.* ¶ 109. It continued to fall in February 2008, when the Company announced the financial results for the second quarter of FY 2008, noting PND sales had fallen by $29 million compared to the same period in the previous year, in part due to sale of older products at substantial discounts. *Id.* ¶ 113.

The lead plaintiff, Arkansas Public Employees' Retirement System ("Appellant"), a purchaser of common stock between April 26, 2007, and February 5, 2008, sued the Company and three of its officers for securities fraud. Count one of the complaint alleges that the Company violated Section 10(b) of the Act and Rule 10b-5 when its chief executive officers and chief financial officer "knowingly or recklessly propped up [the Company's] stock price by issuing materially false and misleading disclosures regarding the Company's financial condition in fiscal 2007 (ending June 30, 2007) and in fiscal 2008 (beginning July 1, 2007)." *Id.* ¶ 3. They, additionally, "knowingly or recklessly failed to disclose material adverse facts about the [c]ompany's financial condition." *Id.* Count two alleges that three officers were individually liable under Section 20(a) of the Act for the Company's Section 10(b) and Rule 10b-5 violations "[b]y virtue of their positions as controlling persons." *Id.* ¶ 186. The complaint identified a number of allegedly actionable false and misleading statements. Only three statements are at issue on appeal, and they relate primarily to the Company's automotive PND line of business. We quote relevant portions of the alleged statements.

*First*, on April 26, 2007, CEO Sidney Harman stated during a conference call with analysts:

> I had indicated in earlier conference calls that the PND environment in Europe was not as margin challenged as it is in the United States, but that we could surely anticipate it. There was reasonable foresight in that observation. In the recent quarter, the European PND market has become extremely competitive. We are working extraordinarily hard to increase sales and to maintain adequate margins in that environment. In our earnings call three months ago, it was noted that Harman/Becker **PND inventories in Europe had grown substantially**. We said then that the inventory had been developed to support a vigorous sales effort and that **we planned to reduce it to normal levels at year-end**. The plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and **that plan is proceeding**. Where March 31 inventory was $75 million, we expect April 30 inventory to be approximately $50 million, May 31 inventory to be approximately $30 million, and June 30 inventory to be approximately $15 million, that a very normal level.

*Id.* ¶ 57 (bold emphases added). Thereafter, in response to a question by an analyst, the Company CFO, Kevin Brown, stated that the Company had sold 84,000 PNDs during the prior quarter and 300,000 units for the preceding nine months. When asked whether, in light of those numbers, he still expected total PND sales to eclipse 600,000 for the fiscal year, CEO Harman stated: "We do, and we said so." *Id.* ¶ 58 (emphasis omitted). Following the April 26 acquisition announcement and conference call, the Company's stock price rose from $102.56 to $122.50, closing the next day at $122.59. At the beginning of the conference call the moderator had stated that "certain statements by the [C]ompany during this call are forward-looking statements" that "include the [C]ompany's beliefs and expectations as to future events and trends affecting the

[C]ompany's business and are subject to risks and uncertainties." Harman Int'l Indus. Earnings Release Conf. Call Tr. at 1 (Apr. 26, 2007). Persons on the call were "advised to review the reports filed by Harman International with the [SEC] regarding these risks and uncertainties." *Id.*

The complaint alleges that the CEO's forecast for PND sales, particularly his statement that "that plan is proceeding," was materially false and misleading because the defendants "knew or recklessly disregarded that the Company's foray into PND sales in Europe would cause material declines in its operating income as a percentage of net sales." Compl. ¶ 64(a). At the time of the April conference call, the complaint alleges, there was "a large inventory of older generation, obsolete PNDs which [the Company] could not sell or was forced to sell at a substantial loss," and the "prospects for future sales of PNDs were being adversely affected by increasing competition and pressures from competitive pricing." *Id.* ¶ 64(b). The Company's former sales engineer advised that the Company had not sold PNDs up to expectations in either FY 2006 or FY 2007, with the result that the Company "had a stockpile of the devices in inventory," *id.* ¶ 64(c), and that in early 2007, the Company modified its PND design, rendering all of the earlier generation units in inventory obsolete. The Company's former accounting manager advised that the Company had released five different versions of the same PND between March 2006 and July 2007 but did not sell a significant number of the devices until July 2007.

*Second*, on August 29, 2007, the Company filed its FY 2007 year-end Annual Report with the SEC, on Form 10-K, which was signed by the individual defendants. The Report stated: "**Sales of aftermarket products, particularly PNDs, were very strong during fiscal 2007**." Compl. ¶ 82 (emphasis added). Once the Annual Report was publicly released, the Company's stock rose, from $112.93 to $113.39. Early on the

Report stated that it "contains forward-looking statements within the meaning of the [Act]" and that readers should "not place undue reliance on these statements." Harman Int'l Indus. SEC Form 10-K at i (Aug. 29, 2007). The Report listed various factors that "may cause fluctuations in [the Company's] operating results and/or the price of [its] common stock," *id.* at ii, and included a detailed account of the "risk factors," *id.* at 9.

The complaint alleges the statement that the Company's PND sales were "very strong" was "false and misleading when made and/or omitted to disclose material facts necessary to make the statement[] made not misleading." Compl. ¶ 86. Specifically, the Company failed to disclose: (1) the growing inventory of obsolete PNDs, (2) the fact that the Company had missed PND sales targets for the previous fiscal year by more than $85 million, and (3) that the Company had recently sold 100,000 obsolete PND units at a substantial discount.

*Third*, on September 27, 2007, CFO Brown stated during a conference call with analysts that the Company had forecast first quarter FY 2008 sales to be $950 million, up 15 percent compared to the first quarter of FY 2007. When an analyst observed that "the $950 million of revenue expectation is the highest number [the Company had] ever achieved" and asked whether "that observation [is] correct" and "to what degree did the spillover of [Mercedes Benz] C Class revenues influence that number," *id.* ¶ 101, CFO Brown responded:

> Yes, Peter, you are correct that that is a **very strong first quarter** on the top line for us, reflecting getting fully up the ramp curve on Mercedes C Class but also reflecting the fact that <u>we are bringing additional business on stream at Chrysler as we ramp up our Missouri plant and</u> **in the PND business, where we continue the growth and expansion of that business primarily in Europe.**

*Id.* (bold emphases added). The conference call was convened to discuss the Company's almost-completed first quarter FY 2008 financial results and expectations for the remainder of the fiscal year. The conference call's moderator again began the call by stating that "certain statements made by the Company during this call are forward-looking statements" that "include the Company's beliefs and expectations as to future events and trends affecting the Company's business and are subject to risks and uncertainties." Harman Int'l Indus. Guidance Announcement Tr. at 1 (Sept. 27, 2007). Those on the call were "advised to review the reports filed by Harman International with the [SEC] regarding these risks and uncertainties." *Id.*

The complaint alleges that the statement "growth and expansion" would "continue" in the PND business was materially false and misleading, primarily because of the historical evidence of growing inventory, widespread obsolescence, and stagnant sales. Compl. ¶ 102.

Proceeding on a corrective disclosure theory of loss causation, the complaint points to the Company's statements in January and February 2008, allegedly "when [the Company] disclosed [its] deteriorating financial condition and the truth became apparent to the market, [and the Company's] stock fell sharply," eliminating "the prior artificial inflation." *Id*. ¶ 125.

• On January 14, 2008, prior to the opening of the market, a Company press release disclosed revised FY 2008 earnings guidance, "significantly lowering estimates of earnings per share." *Id*. ¶ 109. The release explained that "[t]he change in guidance was prompted primarily by a major shift in the market for Portable Navigation Devices (PNDs). In recent months this sector has experienced significant pricing pressure which is affecting the entire industry." *Id.* The release quoted the statement of the Company's then-CEO, Dinesh Paliwal, that "[w]hile the growth fundamentals of our core business remain

sound, the difficult PND environment presents a challenge." *Id.* The share price of the Company's stock dropped by nearly 40 percent on the day the press release issued. *Id.* ¶ 110.

• On February 5, 2008, the Company announced its FY 2008 second quarter results, stating that "its Automotive division's earnings were 'under pressure' due to PNDs and that it had suffered a gross margin decline from lower margins on PND products; product mix change . . . ; and higher than expected material costs." *Id.* ¶ 112. Operating income for the second quarter of FY 2008 (ending December 31, 2007) was $61 million, or 5.7 percent of sales, as compared to $116 million and 12.4 percent, respectively, for the same quarter of the previous year. The Company's "**PND sales had fallen by $29 million compared to the same period in 2006**" and "PND sales and margins decreased due to aggressive price reduction by competitors, the delay of new products, and **the sale of older products at substantial discounts**." *Id.* ¶ 113 (emphases added) (internal quotation marks omitted). The Company's stock price fell more than 15 percent the next day. According to the complaint, the second quarter report, which was filed on SEC Form 10-Q on February 11, 2008, "disclosed more specifically the reasons why operating income and margins had declined in the first six months of fiscal 2008." *Id.* ¶ 115. That is, "the [recent] gross margin decline was the **result of lower margins on PND products**" attributable to "a significant decline in average market prices, delayed introductions and lower volumes of new generation products and the **inventory clearance of prior generation models at a loss**." *Id.* (emphases added).

The district court granted the defendants' motion to dismiss the complaint on the grounds that the statements during the conference calls fell within the safe harbor for forward-looking statements accompanied by meaningful cautionary statements, and the statement in the FY 2007 Annual Report was "mere

puffery" and inactionable. *In re Harman Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d 26, 46, 50, 51 (D.D.C. 2014). The court did not reach the question whether loss causation had been adequately pleaded. On appeal, Appellant contends that the district court erred because the Company's statements during the two conference calls were neither forward looking, nor accompanied by meaningful cautionary language, and its statement in the FY 2007 Annual Report was not puffery, and further that loss causation and its Section 20(a) claim were adequately pleaded. Our review of the dismissal of the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, is *de novo*. *See English v. District of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013).

## II.

The elements of a claim under Rule 10b-5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 n.3 (2011) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the court need not accept the plaintiff's legal conclusions, the court must assume the truth of all well-pleaded factual allegations in the complaint and draw all reasonable inferences from those allegations in the plaintiff's favor. *See, e.g.*, *de Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013); *Doe v. Rumsfeld*, 683 F.3d 390, 391 (D.C. Cir. 2012). Fraud must be pled with particularity, *see* FED. R. CIV. P. 9(b), and the Act, as amended in 1995, requires a plaintiff to "specify each statement alleged to have been

misleading[ and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1)(B), and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id.* § 78u-4(b)(2)(A).

**A.**

The complaint alleges that none of the Company's statements were entitled to safe-harbor protection because many were not "*identified*" as forward looking and that, "[t]o the extent there were any forward-looking statements, there were no meaningful cautionary statements . . . ." Compl. ¶ 171 (emphasis added). The district court concluded that the parties were "not in dispute as to whether any particular statement is 'forward-looking,'" explaining that although Appellant had alleged that many of the statements "were not *identified* as forward-looking when made," Appellant did not move forward with this theory in briefing on the motion to dismiss. *Harman*, 27 F. Supp. 3d at 40 & n.4. In opposing the Company's motion to dismiss the complaint, Appellant discussed the two statements made during the conference calls under the heading: "Defendants' Forward-Looking Statements Are Not Protected by the PSLRA's Safe Harbor." *See* Lead Pl.'s Mem. in Opp. to Defs' Mot. to Dismiss at 13–15. Characterizing some statements as pertaining to current or historical facts, *i.e.*, not forward looking, Appellant did not characterize the two statements at issue as pertaining to current or historical facts.

Appellant has at least forfeited the argument that the two conference call statements were not forward looking. *See United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 338 (D.C. Cir 2014). It is true that the court has recognized that "'[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.'" *Woodruff v. Peters*, 482 F.3d 521, 525 (D.C. Cir. 2007) (quoting *Yee v. City of*

*Escondido*, 503 U.S. 519, 534 (1992)).  Neither this court's precedent nor the Supreme Court in *Yee* sweeps as broadly as Appellant suggests.  In *Yee*, 503 U.S. at 534–35, the Supreme Court distinguished between a claim (that a city ordinance effected an unconstitutional taking) that had to be raised in the district court and an argument in support of that claim that did not need to be raised in the district court.  Thus, on appeal a party may "refine and clarify its analysis in light of the district court's ruling," *Teva Pharm., USA, Inc. v. Leavitt*, 548 F.3d 103, 105 (D.C. Cir. 2008), including citing "additional support for his side of an issue upon which the district court did rule, much like citing a case for the first time on appeal," *Koch v. Cox*, 489 F.3d 384, 391 (D.C. Cir. 2007).  But that is not what Appellant seeks to do.

Although this court has acknowledged it has discretion to consider issues raised for the first time on appeal, *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992); *see Singleton v. Wulff*, 428 U.S. 106, 121 (1976), it has done so where there are exceptional or otherwise particular circumstances *, see, e.g.*, *Lesesne v. Doe*, 712 F.3d 584, 588 (D.C. Cir. 2013); *Meier, Inc. v. Biovail Corp.*, 533 F.3d 857, 867 (D.C. Cir. 2008).  Declining to address Appellant's new issue would not involve a miscarriage of justice in view of its counseled decision in the district court declining to move forward with the argument that the two statements were not forwarding looking. It is true, as Appellant suggests, that the issue is purely legal and has been fully briefed, but the parties' briefs demonstrate that resolution of the issue is not "beyond any doubt," *Singleton*, 428 U.S. at 121; *see also Lesesne*, 712 F.3d at 588, and to treat the issue as "antecedent to the secondary question of whether cautionary language is meaningful," Reply Br. 4, would extend the concept of "antecedent to and ultimately dispositive of the dispute," *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (internal quotation marks and alteration omitted), in a manner that would recast Appellant's

position in the district court. Nor are we persuaded that the passage of time alone, during which Appellant asserts without substantive elaboration that the law interpreting the safe harbor provision has "evolve[d]," Reply Br. 5, is the type of intervening change in the law that warrants exercising our discretion to consider Appellant's new argument rather than adhering to "our ordinary practice of refusing to entertain an argument made for the first time on appeal," *Volvo Powertrain*, 758 F.3d at 338 (internal quotation marks omitted).

**B.**

To come within the statutory safe harbor, a statement must not only be forward looking (and identified as such), but also "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). The safe harbor defines "meaningful cautionary statements" as those that "identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* We first address the legal standard, then its application.

**1.** Although the statutory text is somewhat ambiguous, *see Slayton v. Am. Express Co.*, 604 F.3d 758, 770 (2d Cir. 2010); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729 (7th Cir. 2004), *as amended* (Sept. 3, 2004), given the variety of possible factual circumstances that could arise, the words Congress chose are not without instructive meaning, even if their application may be unclear in specific circumstances.

Dictionary definitions may not, in and of themselves, be dispositive of whether a particular statement falls within the safe harbor, but they indicate the general nature of the information that Congress concluded must be part of a cautionary statement for safe harbor protection. The word "meaningful" means "significant," 9 OXFORD ENGLISH DICTIONARY 522 (2d ed. 1989), or "having a serious, important, or useful quality or purpose," NEW OXFORD AMERICAN DICTIONARY 1052 (2d ed.

2005). The word "important" means "[h]aving much import or significance; carrying with it great or serious consequences; weighty, momentous, grave, significant," 7 OXFORD ENGLISH DICTIONARY 728, or "of great significance or value; likely to have a profound effect on success, survival, or well-being," NEW OXFORD AMERICAN DICTIONARY 849. The words imply information that is tailored to a particular company's status at a particular time, because cautionary statements that are too temporally general, or advise of a company's performance in the distant past, would not be "significant," 9 OXFORD ENGLISH DICTIONARY 522, to an investor, nor would they have any "useful quality or purpose," NEW OXFORD AMERICAN DICTIONARY 1052. Furthermore, to the extent application of these terms is ambiguous, the legislative history is helpful. Congress's purpose in enacting the safe harbor was to lessen the "muzzling effect" of potential liability for forward-looking statements, which often kept investors in the dark as to what was foreseen for the company by managers "[f]ear[ful] that inaccurate projections w[ould] trigger the filing of securities class action lawsuit[s]." H.R. REP. NO. 104-369, at 42–43 (1995) ("CONF. REP.").

Applying the text and hewing to Congress's purpose, our sister circuits have resolved the definitional ambiguity as follows:

"The requirement for 'meaningful' cautions calls for substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (some internal quotation marks omitted). Thus, "cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the [statements] which the plaintiffs challenge." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009) (internal quotation marks omitted). That

cautionary language must be tailored to the forward-looking statement that it accompanies follows from the statutory requirement that cautionary language must warn of what "could cause actual results to differ materially *from those in the forward-looking statement*." 15 U.S.C. § 78u-5(c)(1)(A)(i) (emphasis added).

By contrast, mere boilerplate — "This is a forward-looking statement: caveat emptor," *Asher*, 377 F.3d at 729 (internal quotation marks omitted) — does not meet the statutory standard because by its nature it is general and ubiquitous, not tailored to the specific circumstances of a business operation, and not of "useful quality," NEW OXFORD AMERICAN DICTIONARY 1052. *See Slayton*, 604 F.3d at 772; *Institutional Inv'rs Grp.*, 564 F.3d at 256; *Asher*, 377 F.3d at 732; *Southland*, 365 F.3d at 372. So too, generalized warnings that forward-looking statements are "not guarantees of future performance . . . and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them," *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009) (internal quotation marks omitted), because such a statement is not specific regarding the business at issue. The Conference Report, in keeping with Congress's intent to "enhance market efficiency by encouraging companies to disclose forward-looking information," states that "boilerplate warnings will not suffice as meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those projected in the statement." CONF. REP. at 43.

At the same time, cautionary language cannot be "meaningful" if it is "misleading in light of historical fact[s]," *Slayton*, 604 F.3d at 770, "that were established at the time the statement was made," *id.* at 769. Such statements are neither "significant" nor of "useful quality or purpose." 9 OXFORD ENGLISH DICTIONARY 522; NEW OXFORD AMERICAN

DICTIONARY 1052. Indeed, the Conference Report states that "[a] cautionary statement that misstates historical facts is not covered by the safe harbor." CONF. REP. at 44. A warning that identifies a potential risk, but "impl[ies] that no such problems were on the horizon even if a precipice was in sight," would not meet the statutory standard for safe harbor protection. *Asher*, 377 F.3d at 733. If a company were to warn of the potential deterioration of one line of its business, when in fact it was established that that line of business had already deteriorated, then, as the Second Circuit explained, its cautionary language would be inadequate to meet the safe harbor standard. *See Slayton*, 604 F.3d at 769–70. By analogy, the safe harbor would not protect from liability a person "'who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (quoting *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)). As this court noted in *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008), there is an important difference between warning that something "*might*" occur and that something "*actually* had" occurred.

Because Congress required that cautionary statements warn of "important factors that could cause actual results to differ," the cautionary language need not necessarily "mention *the* factor that ultimately belies a forward-looking statement." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). That is, Congress did not require the cautionary statement warn of "*all*" important factors, so long as "an investor has been warned of risks of a significance similar to that actually realized," such that the investor "is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Id.* (citing CONF. REP. at 44). Perfect clairvoyance may be impossible because of events beyond a company's control of which it was unaware. *See Asher*, 377 F.3d at 730, 732. Congress required that a

company must warn of factors that "[h]av[e] much import or significance" and "carry[] with [them] great or serious consequences," 7 OXFORD ENGLISH DICTIONARY 728, and which are "likely to have a profound effect on success," NEW OXFORD AMERICAN DICTIONARY 849.

We join our sister circuits' reasoned analysis of the safe harbor requirement that forward-looking statements be accompanied by "meaningful cautionary statements." The words Congress chose provide instructive guidance and the remaining ambiguity in application is informed by and resolved in view of Congress's purpose to protect companies from "[a]busive litigation," CONF. REP. at 42, while still providing investors the information they require to make reasoned decisions, *id.* at 43–44.

**2.** The question, then, is whether the Company's statements during the two conference calls were accompanied by warnings specific to the Company and tailored to the specific forward-looking statements, not mere boilerplate, and consistent with the historical facts when the statements were made, thereby carrying out Congress's purpose to ensure that investors have the information they need to make an informed decision on whether or not to invest, or remain invested, in the Company.

The Company does not dispute that PND obsolescence was an "important factor[] that could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. § 78u-5(c)(1)(A)(i), and thus that it was required to alert investors to the risk of obsolescence in order to gain safe harbor protection. *See* Appellees' Br. 32–37. Rather, the Company states that it *did* warn of obsolescence "many times." *Id.* at 35. The moderator began both conference calls by warning generally of risk and referring listeners to the Company's recent Annual Report. The 2006 Annual Report, referred to in the April conference call, stated sales could suffer if the Company failed

to "develop, introduce and achieve market acceptance of new and enhanced products," that it had to "maintain and improve existing products, while successfully developing and introducing new products," and could "experience difficulties that delay or prevent the development, introduction or market acceptance of new or enhanced products," as well as that competitors could "introduce superior designs or business strategies, impairing [the Company's] distinctive image and [its] products' desirability." 2006 Annual Report at 9–10. More specifically, the Company stated that PND "inventories . . . had grown substantially," increasing to approximately $50 million. Compl. ¶ 57 (emphasis omitted). Consequently, the Company concludes that when "[c]onsidered against Dr. Harman's particular warnings about the competitive European PND market, the obsolescence risk was adequately identified." Appellees' Br. 36.

Several of the cautionary statements relied on by the Company consist of boilerplate, such as the generalities in the moderators' comments and the Annual Reports. To the extent other statements were tailored to the Company's PND business operations, the purportedly cautionary statements were not meaningful because they were misleading in light of historical fact. References to amassed inventory did not convey that inventory was obsolete, as opposed to stocked with the latest, cutting-edge models. Even if viewed as implicitly raising the specter of obsolescence, the statements were insufficient for at least the reason that they did not warn of actual obsolescence that had already manifested itself. The court, thus, need not reach the parties' arguments regarding the role of actual knowledge under the safe harbor, 15 U.S.C. § 78u-5(c)(1). *See* Appellant's Br. 24 n.12; Appellees' Br. 37.

The allegations in the complaint plausibly show that by failing to disclose that PND obsolescence that had already materialized and to tailor its cautionary statements to its PND business, the purported cautionary statements were inadequate to

qualify the April conference call statement for safe harbor protection. According to the complaint, when the April conference call was made, the threat of serious obsolescence was materializing, because, according to a former sales engineer, the Company itself had made a modification in *early 2007*, "which rendered all of the older-generation units in inventory obsolete." Compl. ¶ 64(d); *see also id.* ¶ 53. In addition, the Company's 2006 PND sales had been lower than anticipated and this resulted in the Company storing PNDs in a warehouse. *Id.* ¶ 64(c). Furthermore, the Company released five different versions of its PND between March 2006 and July 2007, but at the time of the first conference call had not sold "a significant number." *Id.* ¶ 64(e). By early 2007, the sales engineer had initiated conversations with Company sales representatives regarding the need to lower PND prices in order to remain competitive. *Id.* ¶ 52. Nonetheless, there was no indication during the April conference call that the Company's PND business was compromised by obsolescence, as distinct from inventory, let alone due to the Company's own actions, *see id.* ¶ 64(d).

"[A]s a general matter, investors know of the risk of obsolescence posed by older products forced to compete with more advanced rivals. Technical obsolescence of computer equipment in a field marked by rapid technological advances is information within the public domain.'" *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546–47 (8th Cir. 1997) (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991)) (internal quotation marks and alterations omitted). But the general information provided by the Company about its plan to reduce its substantial inventory did not disclose historical facts that could have affected the success of the plan being discussed. The omission left a misleading picture with regard to the impact of "a large inventory of older generation, obsolete PNDs which [the Company] could not sell or was forced to sell at a substantial loss." Compl. ¶ 64(b). For instance, the Company did not warn as to the problem it faced — here, PND obsolescence — that it

"has experienced, and may continue to experience," certain "problems," *Parnes,* 122 F.3d at 549, or state "in detail what kind of misfortunes could befall the company and what the effect could be," *Harris*, 182 F.3d at 807.

CEO Harman's April statement referred to the Company's plan to draw down its PND inventory to "normal levels," commenting "that plan [wa]s proceeding." Compl. ¶ 57. Yet the purportedly cautionary statements did nothing to distinguish any risk faced by PNDs in particular. The 2006 Annual Report that was referenced by the conference call moderator spoke generally of "products," both "existing" and "new." *See* 2006 Annual Report at 9–10. Even viewing CEO Harman's explanation "that the PND market in Europe was 'extremely competitive' and that the [C]ompany had to work 'extraordinarily hard' to increase sales and maintain margins" as "not merely statements about general market risks, but . . . specific to the European PND market of which Plaintiffs complain," *Harman*, 27 F. Supp. 3d at 46, nothing said during the conference call or in the Annual Report warned of PND obsolescence. Likewise, the Company's statement that it had amassed a sizeable PND inventory does not render the cautionary language "meaningful." CEO Harman's statements that "[i]n our earnings call three months ago, it was noted that Harman Becker PND inventories in Europe had grown substantially" and that a plan had been developed to reduce inventory and "[wa]s proceeding," Harman Int'l Indus. Earnings Release Conf. Call Tr. at 7, is not a warning at all, much less of obsolescence.

The Company's cautionary language is not rendered adequate by the Company's statement during the April conference call that, although it had projected annual sales of 618,000 units, the Company had sold only 300,000 through the first nine months of FY 2007. In isolation, the statement could be viewed as "allowing investors to evaluate for themselves whether [the Company's] projection of 318,000 unit sales in the

fourth quarter was realistic." *Harman*, 27 F. Supp. 3d at 47. But not when viewed in context. When asked whether, even having only sold less than half of its projected year-end total through three quarters of the fiscal year, the Company could still hit its target, CEO Harman responded unequivocally that it could. Stating that the Company was capable of nearly doubling its three-quarter sales totals in the last quarter does not warn investors that the Company was facing serious obsolescence in its PND products, *see* Compl. ¶ 64(b).

The circumstances recounted in the complaint are not unlike those in *Lormand*, 565 F.3d 228. The issue there was whether US Unwired had provided meaningful cautionary language with statements about its affiliation with Sprint. *Id.* at 231–33. To simplify, US Unwired was forced over a period of several years to change its working relationship with Sprint in a manner that destroyed US Unwired's business model. *Id.* at 232–38. US Unwired nevertheless made a series of statements touting its relationship with Sprint and the growth and vitality of its business. *Id.* at 240–41. Accompanying its forward-looking statements were warnings, such as "Sprint PCS may make decisions that adversely affect *our business* like setting the prices for its national plans at levels that may not be economically sufficient for *our business*," *id.* at 245 (emphasis added). The Fifth Circuit, drawing inferences in US Unwired's favor, concluded that references to US Unwired's "business" were "very vague and general." *Id.* at 246. With respect to risks related to a no-deposit program offering service to low-income and risky credit subscribers, *id.* at 237, 242, US Unwired warned: US Unwired's "PCS business may suffer because more subscribers generally disconnect their service in the PCS industry than in the cellular industry . . . . We plan to keep our subscriber churn [*i.e.*, turnover] down by expanding network coverage, improving network reliability, marketing affordable plans and enhancing customer care. We cannot assure that these strategies will be successful. A high rate of PCS subscriber churn could

harm our competitive position and the results of operations of our PCS services." *Id.* at 246. The court held this warning was also insufficient to provide safe harbor protection because, in part, US Unwired only warned of "a future risk of *limited* magnitude that would be averted" while failing to disclose "certain dangers that had already begun to materialize." *Id.* at 247. So too here. The cautionary language included in the Company's April conference call is too general and fails to account for the materialization, rather than abstract possibility, of the important risk posed by PND obsolescence.

The allegations in the complaint also plausibly show that the cautionary language provided during the September conference call was inadequate for safe harbor protection for the same reasons. CFO Brown referred to a favorable projection of revenue, stating "we are bringing additional business on-stream . . . in the PND business, where we continue the growth and expansion of that business primarily in Europe." Compl. ¶ 101 (emphasis omitted). For an investor, "[*e*]*qually* important was 'inventory clearance of prior generation models at a loss,' *i.e.*, inventory obsolescence . . . [that the Company allegedly] *did not disclose for more than six months*." Reply Br. 15. In September, no mention was made of the Company's inventoried products that would not be saleable due partly to obsolescence, or to the stalling of the plan to reduce inventory to normal levels, or to anything else that could warn of the serious obsolescence problem. *See id.* ¶¶ 86(c)-(e). Instead, the cautionary statements are essentially the same as those made during the April conference call: a boilerplate statement about risk generally and reference to the Company's FY 2007 Annual Report, which repeated the general warnings in the FY 2006 Annual Report. (The Company acknowledges that the two annual reports are more or less indistinguishable. *See* Appellees' Br. 35–36.)

The warnings accompanying the September statement, like those that accompanied the April statement, were misleading in

light of historical facts and were not tailored to the specific forward-looking statement the Company made. According to the complaint, by June 2007, the Company had agreed to sell 100,000 PNDs for $110 less than the ordinary $350 price tag. Compl. ¶¶ 56, 86(e). In all, the Company missed its PND sales projected by more than 200,000 units in FY 2007, *id.* ¶ 55, which meant PND sales fell short of projections by at least $85 million, *id.* ¶¶ 56, 86(d). The information provided by the Company's former accounting manager indicated that "the Company had on hand hundreds of millions of dollars worth of obsolete Generation 2 PNDs which were being superseded by newer Generation 3 PNDs in August 2007." *Id.* ¶ 86(c). By the end of FY 2007, there was no longer a mere risk and some evidence of obsolescence, but rather an intractable problem of obsolescence was a reality that the Company failed to disclose. "[T]he risk of which [the Company] warned . . . had already transpired," *Slayton*, 604 F.3d at 770; *see also Lormand*, 565 F.3d at 247, by the time of the September conference call, and consequently the Company's cautionary language was not "meaningful." *See id.* at 246–47. Even were it clear that the Company warned of obsolescence, the warnings were misleading because they provided, at most, information about a generalized risk of obsolescence and the general effect that obsolescence could have on sales. The district court did not address whether the cautionary language accompanying the September statement was misleading in light of historical facts. *See Harman*, 27 F. Supp. 3d at 50.

Reinforcing our conclusion that safe harbor protection is unavailable for the September statement is the fact that the Company's cautionary statements remained unchanged despite a significant change in circumstances of material importance to an investor. *See Slayton*, 604 F.3d at 772–73; *see also Asher*, 377 F.3d at 734; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 559 (6th Cir. 2001), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). Despite what had

happened regarding PNDs between April and September, the Company did not update or tailor its cautionary language to make it meaningful, instead relying on the same general prefatory language and reference to the Company's general statements regarding risk in its most recent annual report. *Compare* 2007 Annual Report at 10–11, *with* 2006 Annual Report at 9–10. "The consistency of the defendants' language over time despite" changing circumstances "belies any contention that the cautionary language was 'tailored to the specific future projection.'" *Slayton*, 604 F.3d at 773 (quoting *Institutional Inv'rs Grp.*, 564 F.3d at 256).

The complaint points, moreover, in support of the theory of corrective disclosure, to the Company's January and February 2008 releases that disclosed, allegedly for the first time, the obsolescence problems facing its PND line of business. *See* Compl. ¶¶ 133, 135. CEO Harman had assured investors in April that there was a plan to reduce inventory to normal levels, from $75 million to $15 million by June 30, 2007, *id.* ¶ 57, and CFO Brown had reassured investors in September that the PND business was growing and expanding, *id.* ¶ 101. Thus, over this period the Company failed to disclose what was an historical fact of importance to a reasonable investor: by April, inventory obsolescence was becoming a problem, *see id.* ¶¶ 64 (b), (d), (e); by September it had fully materialized into a serious problem effecting Company revenues, *see id.* ¶¶ 86(c)-(e). Prior to the January and February statements, according to the complaint, the Company had not "even mentioned that rapid obsolescence might pose a material risk to the Company's PND business, let alone that such obsolescence might be caused by the Company's own product changes." Appellant's Br. 21; *see* Compl. ¶ 64(d). Given the rosy picture that the Company painted during the April-September period, investors were unaware of the obsolescence problem until January-February 2008, when the Company, in announcing disappointing financial results in

February 2008, first disclosed PND obsolescence that had resulted in "the sale of older products at substantial discounts." *Id.* ¶ 113 (internal quotation marks omitted).

The Company responds that it needed only to warn of "*risks*," *Harris*, 182 F.3d at 807 (emphasis added), not "*actual* inventory obsolescence," Appellees' Br. 37 (emphasis in original). Nothing in *Harris* purports to afford safe harbor protection based on a statement that risk could come to fruition where that risk has *already* begun to materialize. To conclude otherwise, that even where a risk has materialized a company need only warn that it is a "risk," would render misleading cautionary language sufficient, a result neither the statutory text, nor legislative history, nor precedent supports.

Finally, the Company maintains that the internal reports on which the complaint relies are irrelevant and unreliable, and therefore inadmissible as a matter of law. This is because, the Company continues, the complaint "fails to identify any information about the internal reports, *i.e.*, who prepared them, who received them, how firm the numbers were within them, how they were distributed, or to whom they were distributed, and does not allege that any of the *individual defendants* received and reviewed the internal reports." Appellees' Br. 49–50. The precedent on which the Company relies for its categorical rule is inapposite. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 812 (2d Cir. 1996), held that an "unsupported general claim of the existence of confidential Company sales reports that revealed" information that would render a company's statement misleading was "insufficient to survive a motion to dismiss." Here, the allegation that operating reports exist is not *general* and the operating reports are not the only support for the alleged claims. *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993), held that the particularity requirement was not met by references to an

internal report that did "not indicate who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them." Here, the complaint identifies the internal reports as monthly and annual reports of the Company's Automotive Division, which were "authored by executives of Harman Automotive in Germany and distributed to Harman International executives," including CEO Harman and CFO Brown, and after July 1, 2007, then-CEO Paliwal, as well as to several other executives and lower-level accounting or financial personnel. Compl. ¶ 55.

For these reasons, we hold the allegations in the complaint plausibly show that the April and September statements were not accompanied by meaningful cautionary language and, consequently, were not entitled to safe harbor protection.

## C.

The third statement appeared in the Company's FY 2007 Annual Report. For a statement to be actionable under Section 10(b) and Rule 10b-5, it must be "material" in the sense that it would have "been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2413 (2014) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). The Supreme Court has recognized that "statements of reasons, opinions, or beliefs" can be actionable, *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091 (1991), even when conclusory terms are used, *id.* at 1093. This is because "conclusory terms [like 'high' value and 'fair'] in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Id.* But, "statements [that] are too general to cause a reasonable investor to rely upon them" are immaterial and inactionable. *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187,

206 (2d Cir. 2009). "Puffery" refers to one type of immaterial statement: the sort of "generalized statements of optimism that are not capable of objective verification." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). Statements that constitute puffery employ terms that are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005).

In the FY 2007 Annual Report, the Company stated that "[s]ales of aftermarket products, particularly PNDs, were very strong during fiscal 2007." Compl. ¶ 82. The district court concluded that statement was immaterial puffery because "strong" is "subjective and provides no standard against which a comparison can be drawn." *Harman*, 27 F. Supp. 3d at 51. But the critical inquiry is whether the statement could "have misled a reasonable investor," *San Leandro*, 75 F.3d at 811, and given the context in which it was made, according to the allegations in the complaint, we conclude that the "very strong" statement in the FY 2007 Annual Report is plausibly understood as a description of historical fact rather than unbridled corporate optimism, *i.e.*, immaterial puffery.

PNDs, although only a "rather small component of [the Company's] total portfolio," Harman Int'l Indus. Earnings Call Tr. at 6 (Feb. 5, 2008), were part of the Company's automotive division, which "comprised approximately 70% of [the Company's] business and generated the bulk of the Company's revenue and earnings." Compl. ¶ 141. CEO Harman explained during the April conference call that the Company would undertake a "vigorous sales effort" to reduce PND inventory to "normal levels at year-end," and, when asked whether the Company thought FY 2007 sales totals could double in the final quarter, he responded "[w]e do, and we said so." *Id.* ¶¶ 57–58.

The "very strong" statement was specific about product and time period, and comparable to the statement in *In re Lucent Technologies, Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 559 (D.N.J. 2002), that one of the defendant's products was generating "strong customer acceptance," *id.* (internal quotation marks omitted). The statement in *Lucent Technologies* was held not to be puffery because, given recent fiscal results, "a reasonable investor likely would consider material any information relating to customer acceptance of key products for purposes of making investment decisions." *Id.* The context alleged here is similar. PNDs were part of the Company's largest division and had been the focus of recent public statements. The "very strong" statement could have had the same effect on an investor in the Company's stock and is therefore actionable. Unlike the statements in cases on which the Company relies, the statement was tied to a product and a time period and it was not too vague to be material. *In re Copper Mountain Securities Litigation*, 311 F. Supp. 2d 857, 868 (N.D. Cal. 2004), involved a bare statement that "business remained strong," *id.* (internal quotation marks omitted). So too, the statement in *In re Splash Technology Holdings, Inc. Securities Litigation*, 160 F. Supp. 2d 1059, 1076–77 (N.D. Cal. 2001), that demand was "strong." Statements such as "Food Lion is one of the best-managed high growth operators in the food retailing industry," *Longman v. Food Lion, Inc.*, 197 F.3d 675, 684 & n.2 (4th Cir. 1999), a company had achieved "substantial success" in integrating the sales force of two merged entities, *Grossman*, 120 F.3d at 1121, and a company was "optimistic" and "should deliver income growth consistent with its historically superior performance," *San Leandro*, 75 F.3d at 811, are equally lacking in specifics that an investor could use to evaluate the statement's veracity.

The Company maintains that the "very strong" statement is puffery because it "lacked a standard against which a reasonable investor could expect [it] to be pegged," quoting *City of Monroe*,

399 F.3d at 671. Nothing in *City of Monroe* purports to render inactionable any statement that does not contain its own metric. There the statements — that Bridgestone sold "the best tires in the world," that its products demonstrated "global consistent quality," and that it had experienced strong sales because of "high regard among automakers for our strengths in product quality," *id.* at 670 — appear more in line with generalized boasting, *i.e.*, more "squishy," *id.* at 671, than the Company's report of "very strong" PND sales in the FY 2007 Annual Report. Alternatively, the Company maintains that "disclosure of the actual sales results renders the 'very strong' statement immaterial" because investors could review the relevant information and undertake their own evaluation of the Company's statement. Appellees' Br. 53. The Company points to nothing in the current record showing that it had elsewhere disclosed FY 2007 PND sales results.

## D.

A claim under Section 10(b) and Rule 10b-5 requires proof of "the traditional elements of causation and loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *see* 15 U.S.C. § 78u-4(b)(4). A plaintiff may survive a motion to dismiss the complaint for failure to state a claim "*either* by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that . . . the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014) (internal quotation marks omitted). The 2008 consolidated class complaint alleges the former. *See* Compl. ¶¶ 109–13, 125–38; *see also* Reply Br. 23. At the pleadings stage, a plaintiff need not "demonstrate . . . that the corrective disclosure was the *only* possible cause for decline in the stock price." *Carpenters*, 750 F.3d at 233. And "a corrective disclosure need not be a

'mirror-image' disclosure — a direct admission that a previous statement is untrue," although it "must relate to the same subject matter as the alleged misrepresentation." *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013). Thus, "[t]he appropriate inquiry is whether" the Company's statements, taken "as a whole, plausibly revealed to the market that" the Company was experiencing significant difficulties in its PND business. *Id.*

The Company maintains, unpersuasively, that the complaint failed adequately to plead that the alleged misrepresentations or other fraudulent conduct proximately caused economic loss to Appellant. According to the complaint, the Company's January 14, 2008, press release on revised earnings guidance and its February 5, 2008, press release announcing results for the second quarter of FY 2008 disclosed that the Company's PND business was not as strong as previously indicated in the three statements now at issue. Both releases were followed by marked declines in the Company's stock price, the first by a 37.65 percent decline and the second by a drop of 15 percent, *see* Compl. ¶¶ 110, 114. The alleged releases were not, as the Company suggests, simply "announcement[s] of a failed projection." Appellees' Br. 56. Rather, they provided specific information about the state of the Company's PND business, disclosing, allegedly for the first time, that it was not flourishing as the Company had indicated during the April and September conference calls and the FY 2007 Annual Report.

The Company responds that "the Complaint, on its face, identifies so many alternative reasons for [Appellant's] share price drop that [Appellant] cannot prove loss causation as a matter of law." Appellees' Br. 58. But "[p]laintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price." *Carpenters*, 750 F.3d at 233. The cases cited by the Company are not to the contrary. In *Dura*, 544 U.S. at 343, the Supreme

Court explained that a drop in a security's price "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price," concerned what "at the end of the day plaintiffs need . . . establish, *i.e.*, prove," *id.* at 342 (internal quotation marks omitted).  In that case, the complaint failed for absence of allegations on the loss suffered, *id.* at 347, a defect that does not plague the complaint here, *see* Compl. ¶¶ 110, 114.  Other cases on which the Company relies either relate to the plaintiff's burden to obtain judgment, *see Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013); *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009), or do not involve the corrective disclosure theory alleged here, *see Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008).

## III.

Appellant also sued under Section 20(a) of the Act, which provides that "a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant."  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *see also Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 129 (D.D.C. 2009).  A claim under Section 20(a) can exist only if there is a viable claim against the corporation.  *See First Jersey*, 101 F.3d at 1472.  There is a split in the circuits on whether the plaintiff must show that the alleged control person "culpably participated" in the underlying fraud.[1]

---

[1] *Compare SEC v. J.W. Barclay & Co.*, 442 F.3d 834, 841 & n.8 (3d Cir. 2006), *and SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *with Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996); *Brown v. Enstar Group,*

In those not requiring proof of culpable participation, the plaintiff need only show the defendant is a "controlling person," and the burden shifts to the defendant to show the actions were taken "'in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.'" *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) (quoting 15 U.S.C. § 78t(a)).

The court need not decide which approach to adopt because the allegations in the complaint suffice to show culpable participation by the individual defendants. *See* Compl. ¶¶ 142–167. According to the complaint, each personally made actionable statements: CEO Harman during the April conference call, CFO Brown during the September conference call, joined by CEO Paliwal, and each individual defendant also signed in August 2007 the SEC Form 10-K for the FY 2007 Annual Report containing the "very strong" statement. Even if corporate job titles may not alone suffice, *see* Appellees' Br. 62, the complaint plausibly alleges each defendant made false and misleading statements about the Company.

Accordingly, we reverse the dismissal of the complaint for failure to state a claim with respect to the three statements at issue, and we remand the case for further proceedings.

---

*Inc.*, 84 F.3d 393, 396 (11th Cir. 1996); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *Metge v. Baehler*, 762 F.2d 621, 630–31 (8th Cir. 1985); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981); *and Carpenter v. Harris, Upham & Co., Inc.*, 594 F.2d 388, 394 (4th Cir. 1979).