NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0512n.06

Nos. 13-4059/13-4354

**FILED**
Jul 11, 2014
DEBORAH S. HUNT, Clerk

### UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| In re: KBC ASSET MANAGEMENT N.V., | ) | |
| | ) | |
| Movant-Appellant. | ) | |
| | ) | |
| -------------------------------------------------------------------- | ) | |
| | ) | |
| FLORIDA CARPENTERS REGIONAL COUNCIL PENSION PLAN, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| EATON CORPORATION; ALEXANDER M. | ) | |
| CUTLER; MARK M. MCGUIRE; VICTOR J. LEO; | ) | |
| TARAS G SZMAGALA, JR.; DONALD J. | ) | |
| MCGRATH, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE:     ROGERS and COOK, Circuit Judges; MURPHY, District Judge.[*]

ROGERS, Circuit Judge.   KBC Asset Management appeals the district court's grant of Eaton Corp.'s motion to dismiss KBC's securities fraud complaint.  This dispute arose out of a separate trade secrets lawsuit that Eaton filed against its competitor, Frisby Aerospace.  That lawsuit eventually devolved into a lengthy inquiry into several unsavory litigation practices adopted by Eaton.  The company intentionally refused to turn over responsive documents during

---

[*] The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

discovery and hired a friend of the trial judge to engage in ex parte conversations with the judge. During an investigation into this misconduct, Eaton spokespeople repeatedly said that the company had not attempted to influence the judge improperly. KBC argues that these denials amounted to securities fraud. The district court disagreed and dismissed KBC's complaint because it did not allege facts that created a strong enough inference of scienter and because the complaint failed to adequately plead loss causation. Apart from whether scienter was sufficiently pled, the complaint was properly dismissed because KBC's complaint does not contain plausible allegations of loss causation.

The events that gave rise to this securities fraud action began more than ten years ago. Eaton is a "diversified power management company" whose stocks are publically traded. In 2002, several Eaton engineers left the company and joined Frisby Aerospace, one of Eaton's competitors. About one year later, an ex-Frisby employee named Milan Georgeff informed Eaton that the engineers had stolen propriety information from Eaton and given it to Frisby. Eaton agreed to employ and compensate Georgeff in return for his promise to testify in any civil suit filed against Frisby. Based on Georgeff's allegations, Eaton sued Frisby in Mississippi state court on July 9, 2004. The case was assigned to then-Judge DeLaughter.

In 2005, a discovery dispute arose between the parties. Frisby asked Eaton to produce any compensation or consulting agreement between it and Georgeff. Eaton denied making any compensation agreement and did not produce any responsive documents. But Georgeff independently produced the agreement in a separate wrongful termination lawsuit between him and Frisby in North Carolina. After obtaining the agreement, Frisby moved for dismissal and sanctions. Judge DeLaughter held a hearing and appointed Jack Dunbar as special master to investigate the alleged discovery violations. On June 13, 2006, Dunbar issued a Report and

Recommendation that determined that Eaton had committed discovery violations. Dunbar later concluded Eaton acted intentionally.

Eaton then hired Ed Peters. Before taking the bench, Judge DeLaughter had served as an assistant prosecutor for Hinds County. While working there, Peters, the district attorney, was DeLaughter's mentor and close friend. KBC claims, and the subsequent events appear to indicate, that Eaton hired Peters to influence Judge DeLaughter. Eaton hired Peters to work on the Frisby case and offered him a contingency fee of one percent of any judgment Eaton might recover. On April 6, 2007 (after Ed Peters became involved), DeLaughter rejected most of Special Master Dunbar's findings and blamed Eaton's misconduct on its local counsel. DeLaughter subsequently ruled that the Frisby engineers, who were also facing a federal prosecution, needed to testify before their criminal trial date. This was problematic because the engineers had an incentive to plead the Fifth Amendment in light of their upcoming criminal trial. Furthermore, after Dunbar continued to make recommendations adverse to Eaton, DeLaughter replaced Dunbar with Larry Latham, supposedly after discussing Latham's appointment with Peters.

In November 2007, several individuals were indicted on bribery charges in an unrelated case that also involved DeLaughter and Peters. In January 2008, DeLaughter recused himself and it was publicly reported that the FBI was expanding the investigation to possible misconduct in the Frisby case. At this point, the media picked up the story, and there was speculation that Eaton had a hand in Peters' actions. Judge Yerger was assigned to the case and a new special master was appointed, and discovery stopped while an investigation commenced. In late 2008, the new special master uncovered evidence indicating that Peters had engaged in improper ex

parte talks with DeLaughter. More discovery ensued, and in March 2009 the litigation was stayed so that Judge Yerger could evaluate Eaton's role in the controversy.

Meanwhile, the government filed an outline of Peters' expected testimony in a criminal case involving DeLaughter. The outline said: "Ed Peters is expected to testify that he was brought into the case by Eaton, not as counsel of record, but as someone who could influence Bobby DeLaughter." The class period began on August 2, 2009, the date Eaton responded to the government outline. An Eaton spokesperson said: "In no way did we ask Ed Peters to imply or ask or insinuate that he would do anything improper in trying to influence Judge DeLaughter or any other judge." The company also denied breaking Mississippi law by promising to compensate Georgeff. The company made similar statements concerning Georgeff and Peters through the class period.

On January 6, 2010 Judge Yerger imposed a $1.5 million sanction on Eaton for refusing to disclose its agreement with Georgeff. On August 11, 2010, the special master filed a report and recommendation recommending that Eaton's lawsuit be dismissed. Judge Yerger agreed, and on December 22, 2010, held that "Eaton and its counsel were aware of and, in fact, sanctioned Peters' clandestine actions, either through affirmation or inaction, with then-Judge DeLaughter, for Eaton's benefit."

Additional discovery disputes occurred during the first part of 2012. The company turned over emails between Victor Leo, Eaton's Chief Counsel for Litigation, and Ed Peters in April 2012. These delayed productions raised concerns that Eaton still had not turned over all responsive documents. Eaton was ordered to produce any additional responsive documents, and the company fired Leo and another lawyer. Other executives were required to submit affidavits confirming that all responsive documents had been produced. The company complied, and

turned over about 8,000 pages of documents. In their affidavits, Eaton officers admitted that mistakes had been made and that the company did not properly fulfill its discovery obligations. On May 31, 2012, the affidavits became public. Eaton's shares fell from $43.34 on May 31 to $39.12 on June 4 (the date the class period ended).

KBC filed this securities fraud class action approximately three months later. The complaint alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act. Eaton moved to dismiss, and individual defendant Leo joined that motion. Eaton made four alternative arguments:

> (1) that there was [no] actionable fraud or misrepresentation made by Eaton; (2) that any alleged misstatement would [not] have been material to a reasonable investor; (3) that [neither] Eaton [n]or any of the individual defendants acted with scienter or had any plausible motive to engage in securities fraud; and (4) that [no] causal connection exists between [the] defendants' alleged statements and Eaton's share price.

The district court granted the motion on two of these grounds. The district court assumed that KBC alleged material, actionable misstatements, but concluded that KBC had failed to allege a strong inference of scienter and, in the alternative, had failed to make adequate allegations of loss causation. The district court held that the plaintiffs' allegations regarding loss causation were insufficient because they consisted of mere "boilerplate" language and did not plausibly establish that the May 2012 drop in Eaton's share price was caused by Eaton's alleged misleading statements. Further, because it concluded that there was no primary violation, the court also dismissed KBC's claims under Section 20(a), which imposes secondary liability on persons who control an entity that commits a primary violation of the securities laws. 15 U.S.C. § 78t.

Approximately one month after the district dismissed the complaint, KBC filed a motion for reconsideration of the district court's dismissal under FRCP 59(e) and 60(b) and for

permission to amend its complaint. KBC based its motion on newly discovered evidence in the form of a wrongful termination lawsuit filed by one of Eaton's recently terminated in-house lawyers. KBC attached a second amended complaint that incorporated information from the lawsuit. The district court denied the motion because the court concluded that the amended complaint still would not survive a motion to dismiss. KBC appeals the district court's dismissal of the complaint and its refusal to allow amendment.

KBC failed to plead loss causation adequately because it has not shown that Eaton released new information on May 31, 2012. In a securities fraud action, a plaintiff must show that "the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). KBC's theory of loss causation is:

> (1) Defendants perpetuated a fraud on the market by concealing that Eaton had engaged in illegal activity in connection with the *Frisby* litigation; (2) the fraud became known to the public on May 31, 2012, when investors learned that Eaton had withheld documents and attempted to illegally influence Judge DeLaughter; (3) in reaction, Eaton stock declined precipitously.

Reply Br. at 20–21. However, this argument breaks down in step two because the market already knew that Eaton had failed to meet its discovery obligations and had hired Ed Peters to improperly influence Judge DeLaughter.

The complaint fails to allege that the affidavits disclosed new information. KBC's theory is based on the argument that a drop in a company's share price following the release of a statement correcting a past misstatement can demonstrate that the misstatement inflated the company's share price. *See In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009). Loss causation is "easiest to show when a corrective disclosure reveals the fraud to the public and the [company's share] price subsequently drops." *Id.* According to KBC, it was the May 31, 2012 affidavits that brought the truth to light and the subsequent fall in Eaton's

share price reflected a correction in the market. However, such a theory only works when a "disclosed fact [is] . . . new to the market." *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008). The problem with KBC's theory is that the May 31 affidavits—the alleged corrective disclosures—were old news. Judge Yerger imposed a $1.5 million sanction on Eaton for its discovery violations and dismissed its suit for hiring Ed Peters to improperly influence Judge DeLaughter two years earlier. These sanctions were imposed in part because Judge Yerger concluded that Eaton knew or was willfully blind to the fact that Peters was engaging in ex parte communications. All of this was public information that the market absorbed long before.

Further, the affidavits that were released to the public appear to concern primarily Eaton's failure to turn over documents during discovery and not the hiring of Ed Peters. This is problematic for KBC because the bulk of the alleged false statements related to the hiring of Ed Peters and not to the discovery violations. For example, Eaton said, "[i]n no way did we ask Ed Peters to imply or ask or insinuate that he would do anything improper in trying to influence Judge DeLaughter or any other judge," on August 2, 2009. The statement is arguably misleading because there is evidence that suggests that Eaton did in fact hire Peters to influence Judge DeLaughter.

The complaint quotes language from two different affidavits released before the stock price fell. Alexander Cutler's affidavit said:

> I have learned sufficient information thus far to cause me to believe that Eaton's high standards were not met with respect to its obligations to the Court and opposing parties in this case to search for and produce documents responsive to discovery requests and court orders during 2008 and 2009.

Mark McGuire's affidavit said:

> As the General Counsel of Eaton with oversight of its legal function, I accept responsibility for the failure to produce in 2008 the newly discovered emails. While I delegate responsibility to others in the legal function to handle litigation and particularly discovery matters, I remain the leader of the function and am very disappointed to learn of the serious lapses that occurred in this matter.

These statements both address whether Eaton failed to search for and produce responsive documents. Neither statement mentions Ed Peters, much less "corrects" the misleading aspect of Eaton's statements, i.e. that Eaton did not hire Peters for an improper purpose.

In its discussion of the affidavits, the complaint also quotes a portion of a brief that Frisby filed immediately after the affidavits were released which argues that Eaton intentionally withheld documents. The brief argues that it was "clear from the Affidavits . . . that the concealment of these two critical documents was . . . part of a pattern of . . . intentional concealment." The "two documents" are emails turned over to the court in April 2012 and do concern Ed Peters. But like the affidavits, Frisby's brief appears to address whether Eaton committed discovery violations by withholding information, and not whether or why Peters was hired. Thus the brief does not appear to disclose new, corrective information.

The affidavits also make no mention of Georgeff. The only allegedly misleading statement identified in the complaint that does not relate to Peters concerns Georgeff, the ex-Frisby employee who agreed to testify against Frisby about the engineers stealing trade secrets. On August 2, 2009 the company said "[n]othing we did with that whistle-blower was illegal under Mississippi law." That statement concerns the propriety of Eaton's arrangement with Georgeff (i.e., was it legal to compensate a potential witness in a trial). If the affidavits had admitted that agreeing to compensate Georgeff was wrong, KBC might have alleged a viable loss causation theory. But, as discussed above, the affidavits appear to concern only discovery violations and do not address the rightfulness of wrongfulness of the agreement with Georgeff.

While Eaton arguably failed to live up to its discovery obligations by not producing the agreement between it and Georgeff, the market already knew about the withholding of the agreement, because Judge Yerger sanctioned Eaton for "intentional discovery violations concerning Georgeff," back in 2010.

At oral argument, KBC attempted to explain that the statements made in the released affidavits concerned documents that Eaton had withheld and that *those* documents involved Ed Peters. However, KBC never explains how the market learned about the content of those documents before the dip in Eaton's share price. The complaint says only that the affidavits, not the underlying documents, became public on March 31. Furthermore, the Frisby Brief that KBC cites in its complaint says that "Eaton has recently produced to Judge Weill for *in camera* review more than 8,000 pages of previously unproduced documents that relate to Ed Peters and Judge DeLaughter." If the documents were being reviewed *in camera*, it is not clear how the market could have learned of their contents and used those contents to conclude that Eaton had previously been lying.

Finally, although it is not clear that KBC makes this argument, the two emails between Leo and Peters which became public in early May could not plausibly have caused the drop in Eaton's stock price. These emails, which were disclosed to the court in April 2012, contain correspondence that suggests that Peters was engaging in ex parte talks with Judge DeLaughter. In one email, "Peters advised Leo that Judge DeLaughter was 'spending every free minute' on a crucial ruling in the lawsuit and that 'we are getting priority time.'" A follow up email from Peters said that "he was 'REALLY pushing to get the ox out of the ditch, but the Jdg IS in trial for the next 2-3 weeks,' and 'I'm PUSHING.'" A different email from Peters said: "If you can keep mgmt. off your back for just a short time (relatively) I think they will be VERY pleased

with you." It was the disclosure of these emails that caused the Mississippi court to become concerned that Eaton still had not turned over all responsive documents and led to the production of the 8,000 pages of additional responsive documents and the submission of the affidavits. However, according to the complaint, the content of these emails appeared in a story in the *Cleveland Plain Dealer* on May 12, 2012. Thus the market likely absorbed the information from these emails weeks before Eaton's stock price fell in June. Furthermore, Judge DeLaughter's 2010 decision relied on several different emails involving Peters. In one email, Leo revealed that "Ed Peters has taken his [Judge DeLaughter's] temperature on this meeting and he is recommending that we go forward with it." A different email explained that Peters "intend[ed] to speak with the Court Administrator and the Judge about the trial date," which might "take some finessing." Judge Yerger called these emails "direct evidence and/or strong circumstantial evidence . . . of Eaton's knowledge of Peter's improper contacts." Thus the new emails are cumulative of the information contained in emails already disclosed years before. "Because a corrective disclosure 'obviously must disclose *new* information,' the fact that the sources used in the [alleged disclosure] were already public is fatal to the [plaintiff]s' claim of loss causation." *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011)). Because the complaint does not identify sufficiently new evidence that was revealed to the market, KBC has not plausibly pled loss causation. This court need not address KBC's other arguments. Furthermore, because the failure to plead loss causation adequately is fatal to KBC's § 10(b) claim, its § 20(a) claim against the individual defendants, including Leo, also fails. *See PR Diamonds v. Chandler*, 364 F.3d 671, 697 (6th Cir. 2004).

Finally, the district court did not err in refusing to allow KBC to amend its complaint. Because the district court had entered a final judgment, KBC could not "seek to amend [its] complaint without first moving to alter, set aside or vacate judgment pursuant to either Rule 59 or Rule 60." *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002). This means that the usual "modest requirements of Rule 15" do not apply in this case. *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010). Rather, KBC "must meet the requirements for reopening a case established by Rules 59 or 60." *Id.*

The district court correctly determined that allowing KBC to amend would be futile. We review such a futility determination de novo. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1188 (6th Cir. 1996). Nothing in the complaint changes the fact that the market learned about Eaton's wrongful conduct long before the May 2012 disclosures. In fact, most of the new allegations relate to scienter. But even if the amended complaint created an iron-clad, unassailable inference of scienter, it is still insufficient because it fails to explain how KBC suffered a loss. Thus the district court did not err in refusing to allow the amended complaint.

The judgment of the district court is AFFIRMED.