RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0167p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, on
behalf of itself and all others similarly situated,

*Plaintiff-Appellant*,

*v.*

No. 14-4189

FEDERAL HOME LOAN MORTGAGE CORPORATION;
RICHARD F. SYRON; PATRICIA L. COOK; ANTHONY
S. PISZEL; EUGENE M. MCQUADE,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:08-cv-00160—Benita Y. Pearson, District Judge.

Argued: October 14, 2015

Decided and Filed: July 20, 2016

Before: GUY, KETHLEDGE, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** W.B. Markovits, MARKOVITS, STOCK & DEMARCO, LLC, Cincinnati, Ohio, for Appellant. Jordan D. Hershman, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts, for Appellees. **ON BRIEF:** W.B. Markovits, Christopher D. Stock, MARKOVITS, STOCK & DEMARCO, LLC, Cincinnati, Ohio, Richard S. Wayne, STRAUSS TROY CO., LPA, Cincinnati, Ohio, for Appellant. Jordan D. Hershman, Jason D. Frank, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts, Hugh E. McKay, PORTER WRIGHT MORRIS & ARTHUR LLP, Cleveland, Ohio, for Appellee FHLMC. Mark D. Hopson, Frank R. Volpe, Judith C. Gallagher, SIDLEY AUSTIN LLP, Washington, D.C., for Appellee Syron. Carl S. Kravitz, Caroline E. Reynolds, ZUCKERMAN SPAEDER LLP, Washington, D.C., for Appellee Cook. James K. Goldfarb, Michael V. Rella, Jonathan Bashi, MURPHY & MCGONIGLE, P.C., New York, New York, Joseph C. Weinstein, William E. Donnelly, MURPHY & MCGONIGLE, P.C., Washington, D.C., Steven A. Delchin, SQUIRE

1

PATTON BOGGS (US) LLP, Cleveland, Ohio, for Appellee Piszel.  Michael S. Doluisio, Joseph S. McFarlane, DECHERT LLP, Philadelphia, Pennsylvania, Joseph C. Weinstein, Stephen A. Delchin, SQUIRE PATTON BOGGS (US) LLP, Cleveland, Ohio, for Appellee McQuade.

––––––––––––––––

**OPINION**

––––––––––––––––

JANE B. STRANCH, Circuit Judge.  Lead Plaintiff Ohio Public Employees Retirement System (OPERS) filed a class action suit alleging securities fraud against Federal Home Loan Mortgage Corporation and four senior officers (collectively Freddie Mac).  The district court granted Defendants' motions to dismiss, concluding that OPERS failed to show loss causation. For the reasons stated below, we REVERSE the district court's dismissal of the third amended complaint and REMAND for further proceedings consistent with this opinion.

## I.  BACKGROUND

This lawsuit was brought by a state pension fund serving Ohio public employees that lost significant value in the wake of the sharp decline in the price of Freddie Mac's stock in late 2007.  OPERS alleges that Freddie Mac concealed its overextension in the nontraditional mortgage market—generally composed of instruments known as subprime mortgages or low credit and high risk instruments—and its materially deficient underwriting, risk management and fraud detection practices through misstatements and omissions to investors.  It alleges that the fund suffered foreseeable losses triggered when the risk that had been concealed materialized.

OPERS is a state pension fund that provides retirement, disability, survivor and health care benefits, and services for Ohio public employees.  R. 166, ¶18.  It is the fourteenth-largest retirement system in the United States and its assets fund the benefits for more than 920,000 members.  *Id*.  OPERS alleges that it purchased shares of Freddie Mac common stock between August 1, 2006, and November 20, 2007 (the class period), *id*., and that the value of those shares plummeted when the risks in Freddie Mac's investments, risk management system, financial condition and results were revealed, *id*. at ¶¶270, 271.

Freddie Mac is a government sponsored entity chartered by Congress that operates in the secondary mortgage market. *Id*. at ¶19. Individual Defendants are former Chairman of the Board and Chief Executive Officer Richard F. Syron, *id*. at ¶20, former Chief Business Officer and Executive Vice President for Investments and Capital Markets Patricia L. Cook, *id*. at ¶21, former Executive Vice President and Chief Financial Officer Anthony S. Piszel, *id*. at ¶22, and former President and Chief Operating Officer Eugene M. McQuade, *id*. at ¶23.

As this appeal arises from dismissal of OPERS's third amended complaint (the Complaint), we draw the facts from the allegations therein. We recount the facts relevant to an examination of the loss causation element of securities fraud, which formed the basis of the district court's dismissal. They are stated here only as needed for our examination.

### A. Risk in the Nontraditional Mortgage Market

Congress chartered Freddie Mac in 1970 to maintain liquidity in the secondary market for residential mortgage lending. *Id*. at ¶1. As a government sponsored entity, Freddie Mac's business is limited by statute to the purchase of home mortgages and mortgage-related securities. *See* 12 U.S.C. § 1454(a)(1). It has become one of the largest purchasers of mortgages in the nation. R. 166, ¶25.

Freddie Mac operates its extensive mortgage securitization business in three segments. The primary business segment is the "single family" or "guarantee" portfolio, which guarantees the payment of principal and interest on residential mortgages that it purchases in the secondary market. *Id*. The mortgages are then securitized as Freddie Mac mortgage-backed securities for sale on the capital markets. *Id*. Freddie Mac also operates a multifamily segment, *id*., and an investment segment with a retained portfolio, *id*. at ¶86.

Freddie Mac funds its purchases by issuing short and long-term debt and preferred stock offerings. *Id*. at ¶26. It monitors loan quality through its proprietary automated underwriting system Loan Prospector. *Id*. at ¶28. Based on credit risk scores, the system divides loans into six grades, available to Freddie Mac but not the public, that estimate the risk of default. *Id*. at ¶¶29-31. The four highest grades (A+, AI, A2, and A3, or collectively "Accept Loans"), permit automated underwriting without special representations or warranties from the loan originator.

*Id*. at ¶¶31-32.   Loan Prospector's two lower grades (CI and C2, or collectively "Caution Loans") carry multiple higher risk characteristics and are manually underwritten with additional documentation, representations, and warranties. *Id*. at ¶¶31, 33.

As loan activity declined in the mid-2000s, large mortgage producers began to market nontraditional mortgages aggressively to counteract the slowdown.   *Id*. at ¶40.   While these products carried a higher likelihood of default, they also earned higher fees than prime mortgages.   R. 298-2, PageID 12479.   Freddie Mac participated actively in this new arena to maintain its position as a market leader.   OPERS alleges that when Freddie Mac's internal quality control systems hindered its ability to transact in nontraditional mortgages, these systems were disregarded or adjusted to allow for riskier purchases, as set forth in detail below.

First, Freddie Mac pursued increasingly permissive purchasing strategies that focused on low credit, high risk mortgages, R. 166, ¶¶51, 53-54, and targeted low-to-moderate income borrowers, to acquire loans that were internally considered "subprime-like," *id*. at ¶61.   To increase its purchase of whole loan portfolios and compete more effectively with private issuers, Freddie Mac entered auctions for the sale of loans in bulk.   *Id*. at ¶¶54-55.   It also guaranteed an increasing number of low quality Expanded Approval (EA) loans from Fannie Mae, *id*. at ¶61, as well as from banks known for poor loan quality, *id*. at ¶¶70-72.   As Freddie Mac's purchase pace outgrew its own underwriting capabilities, it increasingly relied on the underwriting systems of third parties, which routinely assigned artificially high quality designations to loans that would have been considered subprime if internally underwritten.   *Id*. at ¶¶73, 75, 130.   OPERS alleges that the more loans Freddie Mac accumulated, the larger the bonuses of Individual Defendants. *Id*. at ¶53.

Second, the boom in Freddie Mac's acquisition of nontraditional mortgages led to less stringent institutional review and circumvention of its own underwriting standards.   The Complaint cites a confidential source, a Senior Director of IT for Freddie Mac's Analytics and Risk Management groups, who recounted that the practice of granting exceptions to otherwise noncompliant loans became so common that a Director of Credit Risk Policy inquired, "Why do we even have a credit risk policy if we allow more exceptions than we have compliance?" *Id*. at

¶59. Ratings agencies were unaware of this practice and awarded mortgage pools artificially high ratings as a result. *Id*. at ¶60.

Third, Freddie Mac's exposure was aggravated by its reliance on antiquated evaluative software and fraud detection measures, which could not keep up with the changes to Freddie Mac's portfolio. *Id*. at ¶96. These deficiencies compromised data quality controls and reporting capability both within Freddie Mac and publicly. *Id*. at ¶¶96-97. Though identified internally in late 2005, *id*. at ¶96, the shortcomings of Freddie Mac's legacy software were not remedied during the class period, *id*. at ¶98.

In combination, OPERS claims, Freddie Mac's permissive purchasing strategies, relaxation of underwriting standards, and deficient evaluation and fraud detection software hastened the deterioration of its single family portfolio. Investment in low quality CI loans grew from approximately $40 billion during the first quarter of 2005 to almost $120 billion at the end of 2007. *Id*. at ¶37. Investment in even lower quality C2 loans grew from around $35 billion to nearly $100 billion in the same period. *Id*. OPERS alleges that by the end of the class period, Freddie Mac had exposed almost $227 billion of its loan portfolio to risk from subprime and other low credit quality products. *Id*. All the while, according to OPERS, the Individual Defendants procured advantageous personal compensation plans and bonuses, exercised stock options, and implemented insider trading incentives. *Id*. at ¶¶7, 52-53, 211, 238-50.

## B. Increasing Risk Exposure

OPERS contends that Freddie Mac was internally aware of the risks associated with its accumulation of nontraditional mortgage products from the beginning, *id*. at ¶46, and used the lack of uniformity among definitions of "subprime" and "Alt-A" to mislead investors. Freddie Mac's external statements differed from its internal reports, *id*. at ¶256(a)-(b), and it used a "deceptive[ly]" narrow definition of subprime in public disclosures that made it "difficult for even sophisticated investors to understand the negative implications of the financial information," *id.* at ¶256(c). Investors' misconceptions were further reinforced by a steady stream of false assurances and mischaracterizations from Freddie Mac's senior officials, including the Individual Defendants. *Id*. According to Freddie Mac's 2007 Second Quarter

Report, "approximately $2 billion, or 0.1 percent . . . of loans underlying our single-family mortgage portfolio, at June 30, 2007 . . . were classified as subprime mortgage loans." *Id*. at ¶182.  OPERS alleges that at the time, the single family portfolio "consisted of approximately $182 billion of C1, C2 and EA loans, which equated to approximately 12% of Freddie Mac's single-family credit guarantee portfolio." *Id*.  Freddie Mac first publicly reported its Alt-A loan exposure in June 2007, when it estimated that Alt-A loans (loans identified as such by the originator or with reduced documentation, *id*. at ¶88), made up less than 10% of Freddie Mac's portfolio, *id*. at ¶87.  According to OPERS, reduced documentation loans actually constituted 29% of the single family portfolio.  *Id*. at ¶90.  As further support for its allegations concerning concealed risk, OPERS offers additional evidence of risk materialization that became available after the close of the class period, including Freddie Mac's subsequent disclosure "that the percentage of loans to borrowers with FICO scores below 620, the percentage of loans with [loan-to-value] ratios above 90%, and the percentage of loans used to refinance a mortgage other than a cash-out refinance, had all increased 50% over the comparable period in 2006."  *Id*. at ¶102.

As the skies above the subprime market began to darken, Freddie Mac dismissed news reports forecasting trouble.  However, on November 20, 2007, the last day of the class period, OPERS contends that the truth of Freddie Mac's exposure was finally revealed in the Third Quarter Financial Results and accompanying press statement.  R. 298-42.  OPERS alleges that this marks the first public disclosure of accurate information previously obscured through misstatements and omissions, namely:

> (a) that [Freddie Mac] in fact had heretofore unrevealed substantial involvement in the nontraditional low credit mortgage industry;
>
> (b) that at least $200 billion of its $700 billion mortgage portfolio was at high risk of substantial losses; and
>
> (c) that for just the 3 months ending September 20, 2007, Freddie Mac had incurred a record $2 billion loss on its mortgage investments, with more significant losses expected.

R. 166, ¶134.   OPERS concludes that "the business of Freddie Mac was far riskier than Defendants had disclosed, and investors were incapable of measuring accurately the true financial performance and risk of Freddie Mac's business."  *Id*. at ¶138(h).

Freddie Mac alleges that when the unanticipated revelations materialized, common stock plunged 29% or $3.29 per share—from $37.50 to $26.74.  *Id*. at ¶191.  The market capitalization loss to shareholders totaled $6.6 billion.  *Id*.  Freddie Mac continued to suffer dramatic losses in the coming year.  Subsequent reports placed its actual net loss for the fourth quarter of 2007 at $3.7 billion.  *Id*. at ¶228.  OPERS alleges that this loss was primarily related to subprime, Alt-A, and other nontraditional credit losses from loans purchased between 2005 and 2007.  *Id*.  In September 2008, the Secretary of the United States Treasury placed Freddie Mac in government conservatorship.  *Id*. at ¶232.

**C.  Procedural History**

OPERS filed a securities fraud class action on behalf of purchasers of Freddie Mac common stock in January 2008, alleging that Freddie Mac violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission (SEC) Rule 10b-5. R. 1.  It filed a first amended complaint in May 2008, R. 22, which Freddie Mac unsuccessfully moved to dismiss the following September, R. 42.  OPERS's second amended complaint, R. 56, likewise withstood Freddie Mac's second motion to dismiss, R. 63, 126.  The district court also denied Freddie Mac's motion to dismiss OPERS's (third) Complaint.  R. 184.  However, in April 2013, the presiding judge recused himself and the case was reassigned.

At this juncture, the district court granted Freddie Mac leave to file a renewed motion to dismiss, R. 281, and granted the subsequent motion with prejudice, concluding that OPERS failed to adequately plead loss causation, R. 330, PageID 15908.  The district court's order also denied OPERS's fourth motion to amend its complaint.  *Id*. at 15909.  OPERS argues on appeal that the district court erred by granting the motion to dismiss, rejecting the materialization of the risk theory of loss causation, and misapplying the corrective disclosure theory.  (Appellant Br. at 3-4.)

## II. ANALYSIS

### A. Standard of Review

The district court's order granting a Rule 12(b)(6) motion to dismiss is reviewed de novo. *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 572 (6th Cir. 2008). We construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly,* 550 U.S. at 556). This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

The court "consider[s] the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Weiner v. Klais & Co. Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (noting documents that a defendant attaches to a motion to dismiss are also considered part of the pleadings if referred to in the complaint and central to the claim). Denial of leave to amend is generally reviewed for abuse of discretion. *Sec. Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1008 (6th Cir. 1995). However, when a district court denies a motion to amend based on the determination that the amended pleading would not withstand a motion to dismiss, we review the decision de novo. *Demings v. Nationwide Life Ins. Co.*, 593 F.3d 486, 490 (6th Cir. 2010).

Issues not examined by the district court are ordinarily not considered on appeal. *See e.g., Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). In light of this rule, and the fact-intensive questions that remain in this case, we limit our review to that considered by the district court, namely, whether OPERS has sufficiently alleged loss causation at the pleading

stage.  R. 330, PageID 15908.  In so doing, we express no opinion on the ultimate merits of the securities fraud claims.

### B.  Legal Standards

Section 10(b) of the Securities Exchange Act provides a right of action to purchasers or sellers of securities.  15 U.S.C. § 78j(b).  It forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  *Id*.  This section is implemented through Rule 10b-5, which proscribes, among other things, "the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'"  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting 17 C.F.R. § 240.10b-5) (alterations in original).  The right of action provided to the purchasers and sellers of securities through the Securities Exchange Act resembles common law tort actions for deceit and misrepresentation, though it is not identical. *Id.*

A prima facie securities fraud action under § 10(b) and SEC Rule 10b–5 requires a plaintiff to allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)).  Federal Rule of Civil Procedure 9(b) heightens the general "short and plain statement" pleading standard of Rule 8(a)(2) for a complaint alleging fraud or mistake, which must be stated with particularity.  The Private Securities Litigation Reform Act of 1995 (PSLRA) further heightened the pleading standard by requiring private securities complaints containing allegations of false or misleading statements to both "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(1)(B), (b)(2)(A).

## C. Theories of Loss Causation

A party that brings a securities fraud claim bears the burden to prove "that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). This is "not meant to impose a great burden upon a plaintiff," but to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm.*, 544 U.S. at 347; *see also id*. at 346 ("[W]e assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss."). At the dismissal stage, it is sufficient that OPERS's allegations be plausible— no final determination of amount of loss or its cause is required. *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 478 (S.D.N.Y. 2012) (denying defendant Fannie Mae's motion to dismiss stockholders' § 10(b) and Rule 10b-5 claims because, in part, stockholders adequately alleged their investment loss was caused by misstatements of risk management controls).

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted). It partakes of the traditional elements of loss and proximate causation. *See Dura Pharm.*, 544 U.S. at 346. Any analogy to the common law tort concept, however, would be imperfect because the alleged misstatements do not generally cause a security to drop in value, but rather, the "underlying circumstance that is concealed or misstated." *Lentell*, 396 F.3d at 173. Thus, in the securities fraud context, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Id*. (emphasis in original).

This court has acknowledged in an unpublished decision that loss causation can be shown through a corrective disclosure. *See In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014). Under the corrective disclosure theory, a plaintiff alleges "cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of fraud." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). A decisive majority of circuits have also recognized the alternative theory of materialization of the risk, whereby a plaintiff may allege

"proximate cause on the ground that negative investor inferences," drawn from a particular event or disclosure, "caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement." *Id.*; *see also In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 110 (D.C. Cir. 2015); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 428-29 (3d Cir. 2007); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 187-88 (4th Cir. 2007); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009); *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007); *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008); *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013); *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1156 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 499 (2015).

When considering Freddie Mac's motion to dismiss, the district court rejected OPERS's materialization of the risk argument, stating that it was a "theory not adopted by the Sixth Circuit or persuasive to the Court." R. 330, PageID 15907. While we have not yet considered this issue directly, our prior decisions, both controlling and unpublished, recognize the viability of alternative theories of loss causation. *See In re KBC Asset Mgmt. N.V.*, 572 F. App'x at 360 (implicitly recognizing alternative theories as "loss causation is 'easiest to show when a corrective disclosure reveals the fraud to the public and the [company's share] price subsequently drops'") (alteration in original); *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009) (observing that a single sentence in an article reporting defendants' "struggles to overcome major glitches" was insufficient to satisfy plaintiff's burden to "show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market").

We are mindful of the dangerous incentive that is created when the success of any loss causation argument is made contingent upon a defendant's acknowledgement that it misled investors. Our sister circuits are too and have recognized that defendants accused of securities fraud should not escape liability by simply avoiding a corrective disclosure. *See Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013) (reasoning by reference to a Fifth Circuit case, that "a defendant's failure to admit to making a misrepresentation, or his denial that

a misrepresentation was made" should not shield him in the loss causation analysis, lest he avoid liability by simply refusing to concede that a prior misstatement was false).

In light of our applicable precedent and the clear weight of persuasive authority, we join our fellow circuits in recognizing the viability of alternative theories of loss causation and apply materialization of the risk in this case.

**D.  Materialization of the Risk**

Freddie Mac asserts that even if the court recognizes materialization of the risk as a viable theory, OPERS has failed to sufficiently allege loss causation.  First, as the district court noted, Freddie Mac's quarterly and annual disclosures did provide a description of its assumption of risk.  R. 330, PageID 15901.  As explicitly stated in Freddie Mac's 2006 Annual Report,

> To improve our ability to better fulfill our mission, we have increased our participation in nontraditional mortgage market products. . . .
>
> Product mix affects the credit risk profile of our Total mortgage portfolio. . . .
>
> . . . We expect each of these products to default more often than traditional products and we consider this when determining our credit and guarantee fees. . . . We will continue to monitor the growth of these products in our portfolio and, if appropriate, may seek credit enhancements to further manage the incremental risk.

R. 298-2, PageID 12478-79.

These statements, however, mean little if OPERS's allegations of systemic mismanagement within Freddie Mac are to be believed—as all well-pleaded allegations must be at this stage.  Freddie Mac's financial reports highlighted rigorous underwriting requirements and quality control standards as key focus areas for management of credit risk.  *Id*. at 12476.  All the while, OPERS contends, and we accept as true, Freddie Mac disregarded its internal controls through such practices as artificial inflation of property values to lower loan-to-value ratios, R. 166, ¶¶62-63, excessive application of exceptions to otherwise non-qualifying loans, *id*. at ¶59, purchase of increasingly risky products, *id*. at ¶¶51-55, 72-73, and reliance on outdated evaluative software and fraud detection measures, *id*. at ¶¶96-99, 108-12.

OPERS alleges to be untrue Freddie Mac's assertion that the quantitative data in its financial reports gave investors an accurate picture of its risk exposure. As explained above, Freddie Mac claimed that .01% of the loans in its single family portfolio were subprime, while OPERS alleges this number is closer to 12% when low quality loans like CI, C2, and EA are considered. *Id*. at ¶182. It also alleges that Freddie Mac made no public disclosure of its Alt-A holdings until June 2007, well into the class period, reporting that they made up 8% or $120 billion of the portfolio when such loans actually consisted of $462 billion or 29% of the portfolio. *Id*. at ¶87-90. As the Supreme Court observed in the context of a separate section of the Securities Exchange Act, "not every mixture with the true will neutralize the deceptive." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991). "If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *Id*.

In a similar case, *SEC v. Mudd*, the court found that regular financial reports did not sufficiently correct defendants' alleged misstatements to investors regarding Fannie Mae's level of subprime exposure. 885 F. Supp. 2d 654, 666-67 (S.D.N.Y. 2012). Like Freddie Mac's financial reports, those considered in *Mudd* measured loans based on borrowers' FICO scores and loan-to-value ratios. *Id*. However, defendants' reports "did not define subprime loans" by these metrics, nor did they measure loans by adequacy of documentation to show Alt-A exposure. *Id*. at 667. The court found it was "not clear that this data would have corrected, clarified, or rendered immaterial [Fannie Mae's] subprime exposure calculations." *Id*. In holding that defendants' disclaimers and warnings did not preclude liability, the court quoted the Second Circuit's conclusion that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Id*. (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)).

In addition to inaccurate quantitative data, the Complaint also alleged instances of Freddie Mac's internal recognition that its public statements regarding exposure were misleading. For example, in May 2007, the then-Head of External Reporting reviewed a draft speech to be delivered by Syron at the UBS Global Financial Services Conference. He suggested in an email that references to subprime loan exposure be refined:

> We need to be careful how we word this.  Certainly our portfolio includes loans that under some definitions would be considered subprime.  Look back at the subprime language in the annual report and use that as a guide as what to say.  Basically, we say we don't have a definition of subprime and we don't acquire loans from subprime lenders.  We should reconsider making as sweeping a statement as we have "basically no subprime exposure."

R.166, ¶83.  This advice was rejected, however, and at the conference a few days later, Syron included the original language in his speech:  "As we discussed in the past, at the end of 2006, Freddie had basically *no subprime exposure* in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."  *Id*. at ¶84 (emphasis added).  Cook repeated this statement a few days later when she delivered a speech at the Lehman Brothers Tenth Annual Financial Services Conference.  *Id*. at ¶85.  The Complaint details many additional communications to investors to the same effect.  *See e.g.*, *id*. at ¶¶140-43, 156, 164, 177.

Freddie Mac draws our attention to *Central States, Southeast and Southwest Areas Pension Fund v. Federal Home Loan Mortgage Corp.*, 543 F. App'x 72 (2d Cir. 2013), which it characterizes as "virtually identical" to the present case.  In an unpublished opinion, the Second Circuit affirmed the dismissal of investors' claim against Freddie Mac for failure to meet the pleading requirements for loss causation.  *Id*. at 77.  The *Central States* investors purchased Freddie Mac stock during a class period that ran from November 20, 2007, to September 7, 2008, the day it was announced that Freddie Mac would be placed into conservatorship.  *Id*. at 73.  The court rejected investors' loss causation argument that the stock price fell after news articles and independent analyst reports in 2008 revealed that Freddie Mac's prior statements claiming it was "adequately capitalized and had sufficient internal controls" were false.  *Id*. at 74.

That case, though not controlling in the Sixth Circuit and factually distinguishable, lends support to our conclusions.  November 20, 2007, is indeed a familiar date but it stands at the beginning of the class period in *Central States*; here it stands as the *end* of the class period.  That makes all the difference.  The court in *Central States* emphasized that on the first day of its class period, Freddie Mac "reported a loss of more than $2 billion, causing its stock price to fall from $37.50 at the close of trading on November 19 to $26.74 at the close of trading on November 20."  *Id*.  On that day, Freddie Mac also disclosed "its increased involvement in nontraditional mortgage markets and the 'greater credit risks' from 'increased delinquencies and credit losses'

involving nontraditional mortgage products." *Id*.  Given these disclosures, the court reasoned, investors could not "plausibly allege that they were not on notice of the true gravity of Freddie's situation until corrective disclosures began to be published on July 3, 2008." *Id*. at 74-75.  Based on the class period in the present case, OPERS could and did plausibly allege that it was not on notice.  OPERS's position differed from that of Central States, as it had purchased stock before November 20 under the misimpression (allegedly fostered by Freddie Mac) that Freddie Mac adequately protected its higher-risk purchases, had virtually no subprime exposure, and enjoyed more success than its competitors.  The subsequent revelation of loss on the November 20 close of *this* class is well within the "zone of risk" that Freddie Mac allegedly concealed here.  *Lentell*, 396 F.3d at 173.

Based on the allegations detailed above, OPERS's claims can be summarized as follows: Freddie Mac made materially false statements and omissions regarding its extension into the nontraditional mortgage market and its financial health.  R. 166, ¶¶270-71.  When these risks were realized, the market price of Freddie Mac stock dropped dramatically.  Had OPERS known the truth, it would not have invested in Freddie Mac common stock, or would have done so at a much lower purchase price.  *Id*. at ¶270.  OPERS concludes that the 29% loss in stock price that occurred on November 20, 2007, when Freddie Mac disclosed a loss of $2 billion, is "directly attributable to the market's reaction to revelations of the nature, extent, and impact of the fraud at Freddie Mac."  *Id*. at ¶271.

We are not persuaded by Freddie Mac's argument that OPERS fails to "plead[] facts sufficient to exclude more likely explanations for its alleged losses, such as the worst financial crisis since the Great Depression."  (Appellee Federal Home Loan Mortgage Corporation Br. at 51.)  OPERS need only allege sufficient facts to support a plausible claim—not the most likely—at this stage.  *See Twombly*, 550 U.S. at 570.  Having considered "the relationship between the risks allegedly concealed and the risks that subsequently materialized," as well as the close correlation between the alleged revelation or materialization of the risk and the immediate fall in stock price, we conclude that it has done so.  *In re Am. Intern. Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010).

When considering a motion to dismiss, "we must tread lightly . . . engaging carefully with the facts of a given case and considering them in their full context." *In re Omnicare,* 769 F.3d at 473.   Taking the allegations in the Complaint as true and drawing all reasonable inferences in OPERS's favor, we conclude that OPERS has sufficiently alleged loss causation to survive a Rule 12(b)(6) motion to dismiss.

## III.  CONCLUSION

Based on the foregoing reasoning, we REVERSE the district court's dismissal of OPERS's Complaint and REMAND for further proceedings consistent with this opinion.