PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3607
_____

AUSTIN J. WILLIAMS; MARK SILVERSTEIN,
Individually and on behalf of all others similarly situated

v.

GLOBUS MEDICAL, INC.; DAVID C. PAUL; RICHARD
A. BARON; DAVID M. DEMSKI; STEVEN M. PAYNE

Austin J. Williams,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-15-cv-05386)
District Judge: Honorable: Wendy Beetlestone
_____

ARGUED: April 5, 2017

Before: CHAGARES, SCIRICA, and FISHER,
*Circuit Judges*

(Opinion Filed: August 23, 2017)

Jacob A. Goldberg            [ARGUED]
Keith R. Lorenze
Rosen Law Firm
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046

Robert V. Prongay
Jason L. Krajcer
Charles H. Linehan
Glancy Prongay & Murray
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
        *Counsel for Appellant*


Cheryl W. Foung
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304

Barry M. Kaplan            [ARGUED]
Gregory L. Watts
Wilson Sonsini Goodrich & Rosati
701 Fifth Avenue
Suite 5100
Seattle, WA 98104

Marc J. Sonnenfeld
Timothy D. Katsiff
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103
    *Counsel for Appellees*

_____

OPINION OF THE COURT
_____


**SCIRICA**, *Circuit Judge*

In the spring of 2014, Globus Medical, Inc., a medical device company, terminated its relationship with one of its product distributors. Several months later, in August 2014, Globus executives alerted shareholders that sales growth had slowed, attributed this decline in part to the decision to terminate its contract with the distributor, and revised Globus's revenue guidance downward for fiscal year 2014. The price of Globus shares fell by approximately 18% the following day.

Globus shareholders contend the company and its executives violated the Securities Exchange Act and defrauded investors by failing to disclose the company's decision to terminate the distributor contract and by issuing revenue projections that failed to account for this decision. The trial court dismissed the shareholders' suit, and the shareholders appealed. We will affirm.

## I. BACKGROUND

### A. Facts

Globus is a publicly traded medical device company that designs, develops, and sells musculoskeletal implants, particularly for individuals with spine disorders. Globus relies on both in-house sales representatives and independent distributors to sell its products to surgeons and surgical staff nationwide. Vortex Spine, LLC, was one of Globus's independent distributors, serving as the exclusive distributor for Globus's spine implant products in certain portions of Louisiana and Mississippi. Vortex signed its initial Exclusive Distributorship Agreement with Globus in 2004, and the parties renewed the agreement in 2008 and 2010. The 2010 agreement was scheduled to expire on December 31, 2013.

Globus's statements and actions in the wake of the December 31, 2013, expiration of the agreement have become the focus of this case. Plaintiffs allege that Globus decided to terminate its partnership with Vortex around the time of the expiration of the agreement. This was in line with the company's strategy to increase its reliance on in-house sales representatives in the hopes of controlling commission costs and strengthening its control over its sales team. Nonetheless, Globus extended the existing distributorship agreement for four months—through April 2014—and allegedly told Vortex the companies would use this period to negotiate terms for a new distributorship agreement. Plaintiffs contend Globus instead used this period to establish a new in-house sales position to cover the geographic territory being handled by Vortex.

On February 26, 2014—in the midst of the period covered by the extension of the agreement with Vortex—Globus Chief Financial Officer Richard A. Baron projected "sales in the range of $480 million to $486 million, earnings per fully diluted share of $0.90 to $0.92 per share" for fiscal year 2014 during an earnings conference call. A51. A few weeks later, on March 14, 2014, Globus filed its 2013 10-K with the Securities & Exchange Commission. In a section of the 10-K titled "Risks Related to Our Business and Our Industry," Globus cautioned, "If we are unable to maintain and expand our network of direct sales representatives and independent distributors, we may not be able to generate anticipated sales." A46. The risk disclosure added:

> We face significant challenges and risks in managing our geographically dispersed distribution network and retaining the individuals who make up that network. If any of our direct sales representatives were to leave us, or if any of our independent distributors were to cease to do business with us, our sales could be adversely affected. Some of our independent distributors account for a significant portion of our sales volume, and if any such independent distributor were to cease to distribute our products, our sales could be adversely affected. In such a situation, we may need to seek alternative independent distributors or increase our reliance on our direct sales representatives, which may not prevent our sales from being adversely affected.

A47.

5

Globus met with Vortex's founder and manager on April 18, 2014. Globus leadership notified him that Globus had designated a new in-house sales representative to handle distribution for the geographic territory covered by Vortex. Globus proposed a new agreement with Vortex which would require Vortex to turn over its customers to Globus in exchange for a royalty payment and would require Vortex's sales representatives to become Globus employees. Vortex rejected the proposed terms.

Approximately ten days later, on another earnings conference call, CFO Baron again projected Globus would achieve $480 to $486 million in sales, with $0.90 to $0.92 earnings per fully diluted share for fiscal year 2014—estimates identical to those he projected in February 2014. The next day, April 30, 2014, Globus filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2014. In a section titled "Quantitative and Qualitative Disclosure About Market Risk," Globus stated, "We have evaluated the information required under this item that was disclosed in our 2013 Annual Report on Form 10-K and there have been no significant changes to this information." A49–50.

Months later, on August 5, 2014, Globus issued a press release announcing its results for the second fiscal quarter of 2014 and revising its revenue guidance. According to the release, Globus "now expect[ed] full year net sales to be in the range of $460 to $465 million" but added that its earnings per share guidance "remained unchanged." A53. In an earnings conference call held the same day, Globus Chief Operating Officer David M. Demski explained that "domestic sales growth in the quarter was below our historical

6

standards" attributing this development, in part, to the fact that "early in the quarter we made the decision not to renew our existing contract with a significant U.S. distributor, negatively impacting our sales." A53. Demski observed that the company "understood the risks to our short-term results." A53. Globus shares fell $4.05 per share (17.9%) in the wake of the revised revenue guidance to close at $18.51 per share on August 6, 2014. Ultimately, at the fiscal year's end, Globus announced it had achieved $474.4 million in sales, with earnings per share at $0.97—meaning sales for the fiscal year ultimately finished just 1.17% below the initial projection made in February 2014 and earnings per share exceeded the projection by 5.4%.

## B.    Procedural History

Plaintiff Mark Silverstein filed this action in the United States District Court for the Eastern District of Pennsylvania on September 29, 2015, on behalf of "all those who purchased or otherwise acquired Globus securities traded on the New York Stock Exchange [between February 26, 2014 and August 5, 2014] and were damaged upon the revelation of the alleged corrective disclosure." A54. On January 14, 2015, the District Court granted the motion of Austin J. Williams to be appointed lead plaintiff as the person most capable of adequately representing the class.[1]

---

[1] The Private Securities Litigation Reform Act amended the Securities Exchange Act to provide that "[n]ot later than 90 days" after notice to shareholders of the pending securities action, "the court shall consider any motion made by a purported class member in response to the notice, . . . and shall appoint as lead plaintiff the member or members of the

7

By stipulation of the parties, plaintiffs filed an Amended Complaint on February 19, 2016. The Amended Complaint names as defendants Globus, Globus CEO David C. Paul, Globus CFO Richard A. Baron, Globus COO David M. Demski, and Globus Chief Accounting Officer Steven M. Payne. The Amended Complaint alleges the 2013 10-K, 2014 1Q 10-Q, and related earnings calls violated §§ 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated under that Act by the Securities and Exchange Commission.

On March 28, 2016, Globus filed a motion to dismiss the Amended Complaint. The District Court granted that motion and dismissed all claims against all defendants by Memorandum and Order dated August 25, 2016. Plaintiff filed a motion for reconsideration, which the District Court denied on September 12, 2016. This timely appeal followed.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337. We have jurisdiction over the appeal from a final order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) under 28 U.S.C. §

---

purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members[.]" 15 U.S.C. § 78u-4(a)(3)(B)(i). The statute provides a rebuttable presumption that the most adequate plaintiff is the person that "in the determination of the court, has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(bb).

1291. "We exercise plenary review over the order dismissing the complaint, as well as the District Court's interpretation of securities law." *Morrison v. Madison Dearborn Capital Partners III L.P.*, 463 F.3d 312, 314 (3d Cir. 2006).

## III.   ANALYSIS

### A.   Legal Standard

Section 10(b) of the Securities Exchange Act of 1934 prohibits any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the Securities and Exchange Commission under the Exchange Act, makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for relief under section 10(b), a plaintiff must plead facts demonstrating that (1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury.

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004).

All securities fraud claims are subject to Rule 9(b), which requires plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In addition, the Public Securities Litigation Reform Act (PSLRA) imposes two heightened pleading requirements above the normal Rule 12(b)(6) standard. First, "the complaint must specify each allegedly misleading statement, why the statement was misleading, and if an allegation is made on information and belief, all facts supporting that belief with particularity." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (internal quotations omitted) (citing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Accordingly, "[f]ailure to meet the threshold pleading requirements demanded by [Rule 9(b) and the PSLRA] justifies dismissal apart from Rule 12(b)(6)." *Cal. Pub. Emps.' Ret. Sys.*, 394 F.3d at 145.

## B.    Application

Plaintiffs' claims can be divided into two categories: challenges to historical statements, namely the risk disclosures found in Globus's 2013 10-K and 2014 1Q 10-Q; and challenges to forward-looking statements, namely the sales and earnings projections made in the February and April earnings conference calls.  We address each category in turn.

### 1.    Historical Statements

The District Court held that plaintiffs failed to plead actionable omissions from Globus's risk disclosures because Globus had no duty to disclose either its decision to terminate its relationship with Vortex or the completed termination of that relationship.  Plaintiffs argue the District Court erred because the absence of that information rendered the risk disclosures materially misleading.  We disagree and conclude there was no duty to disclose.

"[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b–5(b)).  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  As we have previously held, "[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that

11

information." *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000). The duty to disclose arises "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Id.* at 285–86.

Plaintiffs contend Globus's omission of its decision to terminate its relationship with Vortex falls into the final category because, without that information, Globus's existing risk disclosures were inaccurate, incomplete, or misleading. Globus's risk disclosures in the 2013 10-K and 2014 1Q 10-Q warned that the loss of an independent distributor could have a negative impact on sales—but it omitted to warn investors, plaintiffs argue, that Globus had *in fact* lost an independent distributor.

Once a company has chosen to speak on an issue— even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading. *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490–91 (3d Cir. 1994) ("[E]ncompassed within that general obligation [to speak truthfully] is also an obligation or 'duty' to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated.") (internal citation omitted). Consistent with this principle, courts are skeptical of companies treating as hypothetical in their disclosures risks that have already materialized.

For example, in *In re Harman International Industries, Inc. Securities Litigation*, the United States Court of Appeals for the District of Columbia Circuit considered a company—a manufacturer of information and entertainment systems for automobiles—that touted its considerable inventory of

12

personal navigational devices (PNDs) while also warning generally that its sales depended on its ability to develop new products in a competitive market. 791 F.3d 90, 103–04 (D.C. Cir. 2015). But the company did not disclose to investors that much of its PND inventory had already been rendered obsolete by new technology, forcing the company to cut its prices and reducing its sales revenue. The District of Columbia Circuit suggested the company's general warnings about product obsolescence could be misleading and emphasized, "there is an important difference between warning that something '*might*' occur and that something '*actually* had' occurred." *Id.* at 103.

Similarly, in the United States Court of Appeals for the Ninth Circuit, a government intelligence and surveillance contractor was sued after its revenue dropped by 25% following the cancellation of several contracts. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008). The contracts at issue were subject to "stop-work" orders—which immediately stop payment to the company and often signal eventual cancellation of the contract—but the company included revenue from these contracts as part of its "backlog" of work the company had contracted to do, but had not yet performed. The company warned that "future changes in delivery schedules and cancellations of orders" might mean sales for the year would not match the full backlog value, but the court found the company's representations could be misleading. *Id.* at 986. The company's warning, the court held, "speaks entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition, and that what the company refers to as backlog includes work that is substantially delayed and at serious risk of being cancelled

13

altogether." *Id.*; *see also Siricusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (finding actionable a statement that "speaks about the risks of product liability claims in the abstract, with no indication that the risk 'may already have come to fruition.'"), *aff'd* 563 U.S. 27 (2011).

We agree that a company may be liable under Section 10b for misleading investors when it describes as hypothetical a risk that has already come to fruition. But this is not such a case. In the 2013 10-K filed in March 2014, and incorporated by reference in the 2014 1Q 10-Q a month later, Globus warned, "if any of our independent distributors were to cease to do business with us, our sales could be adversely affected." A47. The risk actually warned of is the risk of adverse effects on sales—not simply the loss of independent distributors generally. Accordingly, the risk at issue only materialized— triggering Globus's duty to disclose—if sales were adversely affected at the time the risk disclosures were made.

Plaintiffs have not plead that Globus's sales were adversely affected by the decision to terminate Vortex at the time the risk disclosures were made. The 2013 10-K was filed in March 2014, while Vortex was still distributing Globus's products under the four-month extension of the existing distributorship agreement. Nothing in the Amended Complaint suggests sales had decreased at that time. The 2014 1Q 10-Q was filed on April 30, 2014—less than two weeks after Vortex rejected Globus's proposed terms for a new agreement. Plaintiffs have not pleaded facts sufficient to show that Globus's sales were adversely affected within that short window. To the contrary, plaintiffs allege Globus had spent months preparing to end its relationship with Vortex and had an in-house sales representative prepared to take over

14

the territory previously covered by Vortex. Nothing in the Amended Complaint permits the inference that Globus was aware of adverse effects on sales prior to the August 5, 2014, earnings conference call when the company revised its revenue projections.

Accordingly, this case is unlike the materialization of risk cases cited by plaintiffs, in which the adverse effects at issue had in fact been realized. In *Harman*, at the time of the company's general warnings about the need to develop new, competitive products, the obsolescence of its PNDs had already led to a reduction in prices and missed sales targets. 791 F.3d at 107 ("by April, inventory obsolescence was becoming a problem; by September it had fully materialized into a serious problem effecting Company revenues") (internal citations omitted). Similarly, in *Berson*, the court noted that stop-work orders—like those that were not disclosed by the company in conjunction with its backlog report—"immediately interrupt the company's revenue stream."[2] 527 F.3d at 986. Accordingly, the circumstances in

---

[2] *In re Facebook, Inc. IPO Securities & Derivative Litigation* is also illustrative. 986 F. Supp. 2d 487 (S.D.N.Y. 2013). Facebook's risk disclosures warned that increased mobile usage might negatively affect the company's revenue, but the court found the plaintiffs had sufficiently plead that the disclosure was misleading. It explained, "Facebook's Registration Statement did not disclose that increased mobile usage and the Company's product decisions had already had a negative impact on the Company's revenues and revenue growth. The Company's purported risk warnings misleadingly represented that this revenue cut was merely

these cases differ from the circumstances here because plaintiffs have not plead that Globus was already experiencing an adverse financial impact at the time of the risk disclosures.

Nor have plaintiffs sufficiently pleaded that a drop in sales was inevitable. Plaintiffs suggest Globus should have known that its sales would be adversely affected by the company's decision to end its relationship with Vortex based on the company's experience with "distributor turnover" in 2010. Plaintiffs note that defendant Paul acknowledged that it took "almost two years" to get Globus back to the same level financially in the wake of that turnover. A48–49. But the Amended Complaint provides no details about the "distributor turnover" in 2010, including how many distributors were involved, whether the distributor or distributors involved were of comparable significance to Globus's sales as Vortex was, whether the turnover was expected, and what, if any, contingencies were in place at the time of the distributor turnover. Absent this information, we cannot conclude that Globus and its executives should have expected a similar financial impact from its decision to terminate its relationship with Vortex as from the 2010 "distributor turnover."

Because plaintiffs have failed to adequately plead that the risk about which Globus warned—the risk of adverse effects on sales as a result of the loss of a single independent distributor—had actually materialized at the time of either the 2013 10-K or the 2014 1Q 10-Q, Globus had no duty to

possible when, in fact, it had already materialized." *Id.* at 516.

disclose its decision to terminate its relationship with Vortex, and the risk disclosures were not materially misleading. We will affirm the District Court's dismissal of the claims based on historical statements.

## 2. Forward-Looking Statements

Plaintiffs contend Globus and its executives violated Section 10(b) and Rule 10b-5 by issuing revenue projections in February and April 2014 that failed to account for the company's decision to terminate its relationship with Vortex. The District Court dismissed these claims because it found that plaintiffs failed to plead facts sufficient to show that the revenue projections were false when made, or in the alternative, the challenged statements were entitled to the protection of PSLRA's safe harbor.

### a. Falsity

Because plaintiffs allege that the revenue projections at issue were false or misleading, their allegations must meet the "[e]xacting pleading requirements" of the PSLRA. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 168 (3d Cir. 2014) (alteration in original, internal quotations omitted). "In addition to requiring plaintiffs to specify each statement alleged to have been misleading, . . . the PSLRA directs plaintiffs to specify 'the reason or reasons why the statement is misleading.'" *Calif. Pub. Emps.*, 394 F.3d at 145 (quoting 15 U.S.C. § 78u–4(b)(1)). These "true facts" allegations cannot rely exclusively on hindsight, but must be sufficient to show that the challenged statements were "actionably unsound when made." *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1430 (3d Cir. 1997); *see also In re*

*NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."). Accordingly, "it is not enough merely to identify a forward-looking statement and assert as a general matter that the statement was made without a reasonable basis." *Burlington*, 114 F.3d at 1429. Instead, plaintiffs were required to plead factual allegations that show the projections were "made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology." *Id.*

In this case, plaintiffs' allegations hinge on their conclusory assertion that Globus's "announced forecast incorporated Vortex's projected sales figures for the remainder of the 2014 fiscal year." A51. To support this claim, plaintiffs draw numerous inferences based on statements made by Globus executives during the August 2014 call explaining the revisions to the revenue guidance. First, they cite defendant Baron's statement that "the decision not to renew the distributor, and the impact to pricing will affect our top line expectations. We now expect full year revenue to be in the range of $460 million to $465 million." A327. This statement, they contend, shows Globus must have incorporated Vortex revenue into their earlier projections—otherwise they would not have needed to revise the revenue forecast downward. Further, because defendant Baron responded, "I don't think we should comment on that," when asked whether the revenue guidance would have been revised "if not for the distributor issue," A336, plaintiffs contend we should infer the loss of Vortex's revenue accounted for the full $20 million downward revision. We agree with the District Court that these allegations

fall short of the exacting pleading standards imposed by the PSLRA. Plaintiffs were required to plead "true facts" sufficient to show the February and April revenue projections were false or misleading when made. But instead of citing contemporaneous sources to show Globus knowingly incorporated Vortex revenue into those projections, plaintiffs rely on conjecture based on subsequent events. This is insufficient. *See In re NAHC*, 306 F.3d at 1330 ("[L]iability cannot be imposed on the basis of subsequent events."); *see also Burlington*, 114 F.3d at 1430 ("Plaintiffs' Complaint contains a number of vague factual assertions regarding the period prior to November 1, 1993, but plaintiffs have failed to link any of these allegations to their claim that the November 1 forecast was actionably unsound when made.").

Even assuming plaintiffs' conclusory assertions were sufficient to infer that Globus's projections incorporated some revenue from Vortex, the Amended Complaint would still fail. Plaintiffs fail to plead specific facts regarding the amount of sales revenue from Vortex projected by Globus; how far short of the projections Vortex sales ultimately fell; and, how significant the shortfall was in the context of Globus's sales overall. Without these facts, plaintiffs do not sufficiently plead that, at the time the projections were made, Globus failed to adequately account for the imminent change in distributorship and any resulting effect on sales. Absent these details, plaintiffs have done nothing more than "assert as a general matter that the [revenue projections were] made without a reasonable basis." *Burlington*, 114 F.3d at 1429.

Further, at the end of the fiscal year, Globus achieved $474.4 million in sales—just less than its initial projection of $480 million to $486 million—and earnings of $0.97 per

19

share—compared to an initial projection of $0.90 to $0.92. In other words, Globus exceeded its projections for earnings per fully diluted share and missed its initial revenue projection by just 1.17%. While the ultimate touchstone is whether the projections were false or misleading when made, plaintiffs' claim that the projections were impossible to achieve is undermined by the fact that the company ultimately substantially achieved the challenged projections. *See Avaya*, 564 F.3d at 266–67. On these facts, we conclude plaintiffs have not adequately pleaded the revenue projections were false or misleading when made.

### b.     Safe Harbor

In the alternative, like the trial court, we find the challenged revenue projections are entitled to protection under the PSLRA's safe harbor. The statute "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254 (citing 15 U.S.C. § 78u–5(c)). We find plaintiffs have failed to adequately plead that the revenue projections were made with actual knowledge of falsehood.

The PSLRA requires plaintiffs in securities class actions to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To meet this standard, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,*

20

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Plaintiffs primarily point to three facts in asking us to infer actual knowledge of falsity on the part of Globus and its executives: (1) during the August 5, 2014, call explaining the revisions to the sales projections, COO Demski stated that the company "understood the risks to our short-term results" when it terminated its relationship with Vortex, A53; (2) during that same call, CEO Paul and CFO Baron acknowledged that they recalled Globus's 2010 experience with "distributor turnover" and the two-year period it took to get the company "back to where [it was]," A45–46; and (3) the nature of the market for spinal implant products and the importance of goodwill between salespeople and customers.

From these facts, it may be plausible to infer that Globus knew or should have known that ending its relationship with Vortex could have some effect on its sales. But, as the District Court correctly noted, actual knowledge that sales from one source might decrease is not the same as actual knowledge that the company's overall sales projections are false. *Silverstein v. Globus Medical, Inc.*, No. 15-5386, 2016 WL 4478826, at \*8 (E.D. Pa. Aug. 25, 2016) ("But simply knowing that the loss of a distributor may cause a drop in sales does not mean that Globus failed to account for this drop in its projections."). Plaintiffs have not pleaded any facts to support their claim that Globus incorporated anticipated revenue from Vortex in its projections. Indeed, given plaintiffs' allegations regarding Globus's extensive, months-long planning for the end of its relationship with Vortex—including the company's broad strategy to transition its sales force from independent distributors to in-house sales

21

representatives and the fact that a new in-house sales representative was in place to take over Vortex's geographic territory before the relationship was terminated—the more plausible inference from the Amended Complaint is that Globus accounted for the change in strategy when it devised its sales projections for the year. Globus's later revision of those projections does not sufficiently show that Globus knew the projections were false when made—particularly when Globus ultimately achieved sales for the fiscal year within 1.17% of the original, challenged projection and exceeded its projection for earnings per share. Absent facts giving rise to a strong inference of scienter, Globus's forward-looking revenue projections are entitled to the protection of the PSLRA safe harbor.

### 3. Section 20(a) Claims

Section 20(a) of the Securities Exchange Act permits plaintiffs to bring a cause of action against individuals who control a corporation that has violated Section 10(b). 15 U.S.C. § 78t(a). "[L]iability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252. Because we affirm the dismissal of plaintiffs' claims under Section 10(b), we also affirm the District Court's dismissal of their Section 20(a) claims.

## IV. CONCLUSION

For these reasons, plaintiffs have failed to adequately plead any violation of the Securities Act on the part of Globus or its controlling officers. We will affirm the District Court's dismissal of all claims.

22